[Crim. Nos. 10330, 10563. In Bank. Apr. 23, 1968.]

In re WILLIAM CAMERON on Habeas Corpus.

(Two Cases.)

George T. Davis, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Edsel W. Haws, Roger E. Venturi and Edward A. Hinz, Jr., Deputy Attorneys General, for Respondent.

TRAYNOR, C. J.—After two trials in which the jury disagreed, a third jury in 1959 found William Cameron guilty of murder in the first degree and fixed the penalty at life imprisonment. Cameron has filed two petitions for a writ of habeas corpus alleging that involuntary confessions were introduced into evidence and that the prosecution deliberately suppressed evidence indicating that he was innocent. The two proceedings have been consolidated.

The Attorney General contends at the outset that habeas corpus is not an available remedy on the ground that Cameron could have raised the contentions now urged on an appeal from the judgment but failed to do so. Although Cameron filed a timely notice of appeal, he failed to prosecute the appeal and on October 28, 1960, the Court of Appeal dismissed it. Cameron points out, however, that at that time there was a

substantial risk that had he secured a reversal of the judgment on appeal he would have received the death penalty on retrial, for it was not until November 1963 that this court overruled *People* v. *Grill* (1907) 151 Cal. 592 [91 P. 515], and held that a defendant who successfully appealed from a judgment imposing life imprisonment for first degree murder could not be given the death penalty on retrial. (*People* v. *Henderson*, (1963) 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677].) Cameron contends that the risk that he might receive the death penalty on retrial excuses his failure to pursue his remedy by appeal and that he acted with reasonable diligence to secure relief after the *Henderson* case was decided.[1]

Habeas corpus is available to challenge violations of constitutional rights relevant to the determination of guilt if the petitioner presents an adequate excuse for failing to invoke his remedy by appeal. (*People* v. *Treloar* (1966) 64 Cal.2d 141, 143-144 [49 Cal.Rptr. 100, 410 P.2d 620]; *In re Spencer* (1965) 63 Cal.2d 400, 406 [46 Cal.Rptr. 753, 406 P.2d 33]; *In re Shipp* (1965) 62 Cal.2d 547, 552-553 [43 Cal.Rptr. 3, 399 P.2d 571].) Although we are not bound by federal standards in determining what constitutes an adequate excuse for failing to invoke the remedy by appeal, we have recognized the relevance of the federal habeas corpus test that permits denial of relief "to an applicant who has deliberately bypassed the orderly procedure of the state courts." (*Fay* v. *Noia* (1963) 372 U.S. 391, 438 [9 L.Ed.2d 837, 868, 83 S.Ct. 822]; see *In re Shipp, supra,* at p. 554; *In re Sterling* (1965) 63 Cal.2d 486, 489 [47 Cal.Rptr. 205, 407 P.2d 5]; *People* v.

---

[1] On September 29, 1964, Cameron filed a petition for habeas corpus in the United States District Court. On December 11, 1964, that petition was dismissed because Cameron had failed to exhaust his state remedies. On December 23, 1964, Cameron filed a petition for a writ of habeas corpus in the Solano County Superior Court. The court denied the petition on February 5, 1965, on the ground that "Petitioner's proper forum is the . . . Court of Appeal whether his prayer for review by that tribunal be for reinstatement of his appeal, for issuance of a writ, or both such remedies." On February 23, 1965, Cameron moved to recall the remittitur and reinstate his appeal in the Court of Appeal for the Third Appellate District. That court appointed a referee to take evidence on stated questions and thereafter on December 6, 1965, denied Cameron's motion on the ground that he had personally abandoned his appeal. Cameron then petitioned for habeas corpus in the Court of Appeal for the First Appellate District, the appellate court having territorial jurisdiction to grant the writ, and that court denied his petition on February 9, 1966. On August 18, 1966, Cameron filed a petition for a writ of habeas corpus in this court alleging the use of involuntary confessions at his trial, and on October 31, 1966, he filed a supplemental petition raising the issue of suppression of evidence.

*Treloar, supra,* at p. 144.) ▇ Since the United States Supreme Court held in *Fay* v. *Noia* that fear of receiving the death penalty on retrial precluded finding that a failure to appeal was a deliberate bypass of a state remedy, we conclude that such fear also excuses a failure to appeal for purposes of state habeas corpus. (See *In re Shipp, supra,* at pp. 555-556.)

▇ The question remains whether Cameron was in fear of the death penalty. In an earlier proceeding to determine whether or not to reinstate Cameron's appeal (see footnote 1, *ante*), the Court of Appeal ordered a reference directed to the question whether Cameron expressly or impliedly approved abandonment of his appeal, and thereafter it concluded that he personally abandoned the appeal. Although the reference was not directed to Cameron's motive for so doing, it appears from the record made before the referee that fear of the possibility that Cameron might receive the death penalty on retrial was a substantial factor in the joint decision of Cameron, his father, and his counsel to abandon the appeal. Accordingly, we conclude that Cameron's abandonment of his appeal does not preclude his seeking relief in these habeas corpus proceedings.

From the record of Cameron's trial, it appears that Vivian Malone was killed and badly mutilated in her trailer at a trailer court on December 22, 1958, between 11 p.m. and 11:50 p.m. Cameron and his friend, Glenn A. Becker III, testified to the events preceding the killing. Both young men were students at Chico State College; each was married and had a baby. Both lived at the trailer court. Earlier in the day, Mrs. Malone had invited Cameron and his wife for a drink. They declined the invitation at that time but stated that they would accept at a later time.

The Camerons had invited the Beckers to a taco dinner. The Beckers arrived about 6:30 p.m. During dinner, between about 6:30 and 8 p.m., Cameron drank about two quarts of beer. The Beckers returned to their trailer after dinner. Shortly thereafter, Becker came back to the Cameron trailer and he and Cameron decided to buy some stout. Between 8 p.m. and 9:30 or 10 p.m., Cameron drank seven or eight cans of stout. Cameron then suggested to Becker that they go to Mrs. Malone's trailer to accept her invitation for a drink.

Vivian Malone was a 50-year-old woman who lived alone. She answered the door clothed in a bathrobe and invited the men in. She had been drinking most of the day and was intoxicated. She brought out a bottle of whiskey, and each

took a tumbler full, approximately two and three-fourths ounces of whiskey, diluted only by one ice cube. As they talked and drank, the conversation turned to sex. Mrs. Malone indicated her willingness to have sexual relations with both men, but both declined.

Cameron testified that he poured himself two more drinks and that he did not know whether Mrs. Malone or Becker had any more to drink. He testified that he had no independent recollection of Becker leaving. He also testified that Mrs. Malone asked him to leave, that he stated he wanted to finish his drink, and that she began to call him foul names. He then recalls being kicked in the groin, but does not remember who kicked him.

He further testified that he remembered nothing that occurred after being kicked in the groin except for vague, fragmentary and disoriented recollections of the following specific facts: He recalled being on his hands and knees and seeing a body and some blood. He remembered sitting on Becker's doorstep. He remembered sitting in a car and hearing someone say that there had been a killing. He remembered being in a room, being interrogated by one of the police officers and Assistant District Attorney Mulkey, and being told that he had killed a woman and severed her breast. He recalled being taken to a hospital and being given a shot. He remembered talking to two psychiatrists and being in the office of a polygraph operator, Mr. MacVarish. He remembered that Mr. MacVarish stated that Mr. Mulkey would not be pleased with the results of the tests and that they would have to be done over. He remembered being interrogated. His memory of all events following the time Mrs. Malone began calling him foul names was very vague and fragmentary.

Becker confirmed Cameron's account of the evening until Becker left Mrs. Malone's trailer about 11 p.m. He also testified that Cameron appeared at Becker's doorstep about 11:50 p.m. He appeared to be dazed, and told Becker that he thought he had killed Mrs. Malone. Becker saw blood on Cameron's white jacket and went over to the Malone trailer, where he saw enough to know that something was wrong. Becker then took Cameron to the Cameron trailer and telephoned the police, who arrived within a matter of minutes, at midnight. They placed Cameron under arrest almost immediately, after being advised by Becker that Cameron was the man they were looking for.

Cameron was placed in a squad car near the Malone trailer

where he waited for about five or ten minutes. During this time, the officers were taking pictures of the interior of the trailer and the area surrounding it. Assistant District Attorney Mulkey had been called to the scene, and viewed the interior of the trailer. He was told the general details of the killing, including the fact that Mrs. Malone's dog and cat had been killed. Actually, the cat was unharmed.

Mr. Mulkey and one of the police officers then drove Cameron to the Chico police station. Mr. Mulkey noted that Cameron appeared to be under the influence of alcohol, and therefore had him examined by a physician at the police station. The physician gave Cameron physical coordination tests and took a blood sample. The blood sample indicated that Cameron had a blood alcohol level of .18 percent. The physician and Mr. Mulkey both concluded, however, that Cameron was mentally competent for interrogation. Cameron was given fresh clothing by the police and may have been questioned before a tape recording[2] of the interrogation was made, beginning at 1 a.m. The tape was made without Cameron's knowledge and he was not advised of his rights. At the end of the taped interrogation, Cameron became hysterical and despondent and asked the police to shoot him. Fearing that Cameron might become suicidal, Mr. Mulkey ordered that he be taken to Butte County Hospital and placed on a mental hold. Cameron arrived at the hospital about 3:20 a.m.

The attending physician at the hospital, Dr. Swinderman, placed Cameron under heavy sedation without knowing that he had a high blood alcohol level of approximately .18 percent and without examining him. He acted upon a nurse's observations of Cameron and the story told her by the police that Cameron had recently committed a murder, was agitated, and was in danger of harming himself. Cameron was sedated by an injection of 300 milligrams of Thorazine (chlorpromazine) at approximately 3:30 a.m. on December 23. The normal

---

[2]The police and Mr. Mulkey deny that Cameron was interrogated before the tape recording was started. At the end of the first tape, however, the following appears:

"(CAMERON): Sheriff, you said take it easy. That's right, you've had your home you can go home to your wife and your baby. I can't. You keep put[ting] me through this. Why do you keep put[ting] me through this . . . You want to see me . . . go through it all . . . time and . . . time over and . . . over again—

"(MR. MULKEY): This is the first time you've been through it, Bill.

"(CAMERON): This is the second time I been through it—the Captain knows and you know!

"(MR. MULKEY): All we want is the truth, Bill."

initial dose is 25 to 50 milligrams,[3] and Thorazine is contra-indicated for persons who are under the influence of alcohol because of the potentiating interaction between alcohol and Thorazine. Cameron was then placed in a padded cell containing only a mattress. The hospital report states that at 3:45 a.m. he was still sobbing loudly, but by 4 a.m. he was sound asleep. He remained sound asleep until awakened so that Mr. Mulkey could take him to DeWitt State Hospital.

At 9 a.m. on December 23, Cameron was taken from the hospital, given breakfast, and driven to DeWitt State Hospital for a psychiatric examination. Mr. Mulkey accompanied him, and stated that Cameron dozed and slept on the trip. When they arrived at DeWitt, Mr. Mulkey told the two psychiatrists the information he had about the crime, and, because he had been misinformed, told them that Cameron had been sedated by sodium amytal[4] at Butte County Hospital. The interview was conducted at 11 a.m. It was not taped, but the two examining physicians testified that they had taken notes. They testified that Cameron's speech was slow and slurred, and that he held his head in his hands as if he were suffering from a hangover. The physicians also testified that in response to their questions Cameron confessed and stated that he remembered killing Mrs. Malone and performing one of the mutilations but did not remember anything else. The interview lasted 20 minutes.

Cameron was then taken by Mr. Mulkey and a police officer to the Criminal Interrogation and Identification Bureau at Sacramento, where they arrived at approximately 1:30 p.m. He dozed and slept in the car on the way. An expert trained in the use of the polygraph as an interrogation technique interviewed him using that technique until 3 p.m. Mr. Mulkey had told the expert the information he had about the crime so that the operator could use that information in his interrogation of Cameron. At the end of Cameron's session with the polygraph operator, Mr. Mulkey conducted another interroga-

[3]Dr. Swinderman testified that he ordered the large dose partly because he had been told the patient might harm himself, but largely for the protection of the staff that might have to go into the room where Cameron was placed. From what he had been told about the nature of Cameron's crime, he was quite concerned for the safety of his staff.

[4]Sodium amytal is a hypnotic sedative. It puts people to sleep. Had Cameron been under the influence of the sedative the doctors thought he had been given, he would have been incoherent or asleep. Accordingly, when they interviewed him, they thought all of the sedation was out of his system. They attributed the mental and physical retardation noted in him to a hangover.

tion that was taped, and Cameron stated that he was aware that his confession was being taped. He confessed for the third time to the murder and mutilation of Vivian Malone, stating that he remembered the events and recounting them in greater detail than before.

The same afternoon, about 4 p.m., Mr. Barr, an attorney retained by Cameron's father, telephoned Sheriff Gillick of Butte County from Yreka and advised him that he had been retained to represent Cameron. The sheriff told Mr. Barr that Cameron was in Sacramento. Mr. Barr testified that he told the sheriff not to take any further statements from Cameron until Mr. Barr could get to Chico, and that he was coming to the county jail. He further stated that Sheriff Gillick told him that they already had their statements. Mr. Barr testified that he then advised the sheriff that unless he could have an assurance that no further statements would be taken until he could get down to Chico, he would call Mr. King, a local attorney, to see Cameron, and that the sheriff indicated it would not be necessary to call Mr. King. Sheriff Gillick acknowledged that Mr. Barr had called him, but denied that he was told not to take further statements. Cameron was not told that any attorney had been retained for him.

Cameron was returned from Sacramento to the Butte County jail at Oroville. He dozed and slept on the way, and arrived at 6 p.m. He was given a change of clothing and dinner. He was then taken to the police jail at Chico, where he was again interviewed, and his fourth confession was taped without his knowledge at 8 p.m. In this confession, Cameron stated that he remembered the events concerning the killing and described what allegedly occurred in much greater detail than in any of the earlier confessions. When Mr. Barr arrived in Oroville on the night of December 23, 1958, he was told that Cameron had been taken to Chico. Mr. Barr telephoned the Chico jail and was informed that Cameron was under sedation and was asleep in his cell. Mr. Barr saw Cameron for the first time the morning of December 24.

We appointed a referee to take evidence and make findings on the question whether each of the taped confessions and the confession to the physicians at DeWitt State Hospital were voluntary and on the question whether any evidence favorable to the defense had been lost or suppressed.

The referee held hearings and heard testimony. He received in evidence a complete transcript of the third trial, the transcripts of the first and second trials to the extent they were

available, and the tape recordings of the first, third, and fourth confessions.

With regard to the first confession, the referee found that although Cameron's speech was slurred, indicating that he was under the influence of alcohol, and that he was emotionally distraught, he was coherent and his answers were rational and responsive to the questions he was asked. Based upon that standard, he concluded that the first confession was voluntary. He found that Cameron was rational and coherent during the second and third confessions, that Thorazine did not impair an individual's ability to answer questions. and that an individual under the influence of Thorazine had the ability to make a choice whether to answer questions. He therefore concluded that these confessions were voluntary. He found that Cameron was not threatened in any manner during the fourth interrogation, and that Mr. Barr did not ask Sheriff Gillick for an assurance that no further interrogations would be had until Mr. Barr had an opportunity to consult with Cameron. He concluded that the fourth confession was voluntary, and stated that even had such assurance been given, the fourth confession was voluntary.

Although we are not bound by the findings of the referee, they are entitled to great weight. (*In re Imbler* (1963) 60 Cal.2d 554, 562 [35 Cal.Rptr. 293, 387 P.2d 6].)

We adopt the referee's finding that Cameron's statements in all four interrogations were rational, coherent, and responsive to the questions asked him. We conclude, however, that the referee erred in using the coherence, rationality, and responsiveness of Cameron's answers as the controlling criterion of their voluntary character. We conclude that Cameron's first statement was voluntary, but that the second, third, and fourth statements were involuntary. Since those statements were clearly prejudicial under any of the standards that have been applied in reviewing constitutional error (see *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824] ; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844]), particularly on the issue of the degree of the crime, the judgment must be set aside.

Since the effect of alcohol is different from that of Thorazine or a combination of both, we sha'l consider the first taped confession separately from the confessions obtained after Cameron had been given Thorazine.

498

■ A confession is involuntary unless it is "the product of a rational intellect and a free will." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]; *Davis* v. *North Carolina* (1966) 384 U.S. 737, 739 [16 L.Ed.2d 895, 897, 86 S.Ct. 1761].) It is not the product of a rational intellect and a free will if the petitioner's will to resist confessing is overborne. (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 520-521 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) ■ An accused's will can be overborne by pressures engendered by physical or psychological coercion on the part of law enforcement officers (*Rogers* v. *Richmond, supra*; *People* v. *Lopez, supra*), or by the influence of a drug (*Townsend* v. *Sain* (1963) 372 U.S. 293, 308-309 [9 L.Ed.2d 770, 782-783, 83 S.Ct. 745]) or insanity (*Blackburn* v. *Alabama, supra*) that impairs his ability to exercise his rational intellect and free will. If an accused's will is overborne because of impairment of his ability to exercise his rational intellect and free will, it is immaterial whether that impairment was caused by the police, third persons, the accused himself, or circumstances beyond anyone's control. (*Townsend* v. *Sain, supra*.) Nor is it material that the officers pursued no improper purpose in eliciting the confession (*Blackburn* v. *Alabama, supra*) or that the facts related by the accused in such a confession are true (*Rogers* v. *Richmond, supra*). ■ The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice. (*Townsend* v. *Sain, supra*.) To determine this issue, the "totality of circumstances" (*Reck* v. *Pate* (1961) 367 U.S. 433 [6 L.Ed.2d 948, 81 S.Ct. 1541]; *Fikes* v. *Alabama* (1957) 352 U.S. 191, 197-198 [2 L.Ed.2d 246, 250-251, 77 S.Ct. 281]; *Payne* v. *Arkansas, supra,* at p. 567 [2 L.Ed.2d at p. 980]) surrounding the interrogation must be considered.

■ Petitioner was 22 years old, had lived a model life, and had had no previous experience with the police. (Cf. *Reck* v. *Pate, supra,* at p. 442 [6 L.Ed.2d at p. 954]; compare, *Stein* v. *New York* (1953) 346 U.S. 156, 185-186 [97 L.Ed. 1522, 1542-1543, 73 S.Ct. 1077].) He was not advised of his rights to counsel, to remain silent, or to refuse to incriminate himself. (*Davis* v. *North Carolina, supra,* at p. 740 [16 L.Ed.2d at p. 897]; *Haynes* v. *Washington* (1963) 373 U.S. 503, 510-511 [10 L.Ed.2d 513, 518-519, 83 S.Ct. 1336]; *Culombe* v. *Con-*

*necticut* (1961) 367 U.S. 568, 610 [6 L.Ed.2d 1037, 1062, 81 S.Ct. 1860]; *Turner* v. *Pennsylvania* (1949) 338 U.S. 62, 64 [93 L.Ed. 1810, 1813, 69 S.Ct. 1352, 1357].) The tape of the first interrogation shows that he was obviously intoxicated and emotionally distraught. His blood alcohol level at the commencement of the tape was .18 percent. When he broke down and became hysterical near the end of the first tape,[5] Mr. Mulkey had him taken to Butte County Hospital and placed on a mental hold for fear he would take his life. When he arrived at the hospital, his emotional state was such that he was diagnosed a schizophrenic. He was overcome with horror by the killing and his assumption that he had done it.

Both Mr. Mulkey and the physician who examined him before he was questioned concluded, however, that he was rational, physically coordinated (compare *Unsworth* v. *Gladden* (D. Ore. 1966) 261 F.Supp. 897), and sufficiently mentally alert to answer questions. The tape indicates that, although his speech was slurred and he had obvious difficulty pronouncing certain combinations of words, he understood the questions asked him and was responsive to them. Although he occasionally rambled on irrelevant subjects, he was generally coherent, appeared rational, and volunteered many details concerning the events of the day up to the point where Mrs. Malone began calling him foul names. Dr. Catton, a defense expert on the effect of alcohol on the body, testified at the trial that the degree of influence alcohol is exerting upon an individual can be measured, to a certain extent, by the coherence, rationality, and responsiveness of his reactions to his surroundings. The coherence, rationality, and responsiveness of Cameron's answers is therefore relevant in determining the extent of influence that the alcohol was then exerting upon him.

The most persuasive evidence, however, that Cameron's will to resist was not overborne during the first interrogation is that he effectively resisted telling Mr. Mulkey what he sought to elicit, namely, any real memory of the details of the crime. At that time everyone, including Cameron, assumed that he

---

[5]The following appears at the end of the first tape:

"(CAMERON): Please get rid of me, Captain.

"(MR. MULKEY): Well, I'm gonna take you up to bed, Bill. Try to get some rest.

"(CAMERON): (unintelligible) . . . I don't want to . . . I just want to . . . Please get rid of me. Just shoot me. Do something. Like I'm a 'scaped convict or something. Look, I've got, I've got plenty insurance for my family everything . . .''

had killed Mrs. Malone. He had already so stated to Becker and a police officer at the scene. The interrogation sought to elicit memory of details that would be relevant to Cameron's mental condition and the degree of the crime. Despite occasional waivering, however, Cameron clung resolutely and emphatically during this hour-long interrogation to his total lack of memory of the events in question. We therefore conclude that in spite of his youth and inexperience with the police, the lack of any warnings of his rights, and his intoxication and emotional turmoil, Cameron's will to resist was not overborne during the first interrogation.

 Although the coherence, rationality, and responsiveness of Cameron's answers, which were relied upon by the referee, are material in determining the extent to which alcohol alone may have impaired his mental facilities, they shed no light on the effect of the Thorazine that was administered to Cameron before he made the last three statements. Moreover, during the course of these statements, Cameron allowed himself to be persuaded by leading questions that he remembered more and more of the details of the crime, including some alleged details that did not in fact occur.

At 3:30 a.m., Cameron was given 300 mgs.[6] of Thorazine. Dr. Burbridge, a University of California Medical Center psychiatrist who specializes in pharmacology and is an expert on the interaction between Thorazine and alcohol, testified that the drug was originally developed as a pre-anesthetic medication to be given to patients to destroy any anxiety they might feel about oncoming surgery. The drug affects a person mentally by reducing the normal anxiety reactions to a point where he is no longer disturbed by what normally would be upsetting factors in his environment. "[T]hey get in such a psychiatric state that input from the environment no longer disturbs them, and hence under the circumstances here in which a person should be keyed to the maximum by the surroundings that he is faced with, of being questioned about a thing that may involve his life, . . . he wouldn't care about

---

[6]All doctors concurred in their opinion that 300 mgs. was inordinately high for an initial dose. Dr. Burbridge described the effect of administering a 300 mg. initial dose of Thorazine to a subject with a .18 percent alcohol blood level as a ''drug-induced lobotomy within reasonable medical probabilities.'' Dr. Jackson, one of the prosecution's doctors, described a lobotomy as a procedure during which the anxiety or worry nerves are severed, so that messages conveying anxiety or worry are prevented from reaching the brain. All doctors concurred in the opinion that the patient's ability to think would not be otherwise impaired to any great degree.

it, it wouldn't bother or concern him. . . .[7] [T]he type of state provoked by this . . . drug is such that an individual would be in a position . . . that he doesn't care what happens to him, that he is not aware that he is being charged with a serious crime, . . . and it doesn't bother him that he is, and if the confession must be a free and voluntary one, he must be keyed to the peak and be able to defend himself, under such a circumstance."[8] According to the testimony of Dr. Burbridge, Dr. Catton and Dr. Adams, presented by the defense, and Dr. Jackson and Dr. Swinderman, presented by the prosecution, alcohol and Thorazine potentiate each other. In Dr. Catton's words, when the two are put together, "one and one just isn't two, one and one is three or four." Dr. Burbridge testified that since the dosage given was inordinately high, petitioner must have been in a borderline shock condition for many hours after the dose was administered, since any dosage larger than that normally recommended (25 to 30 milligrams) will reduce blood pressure, cutting the flow of blood to the brain, and adding to the confusion of the individual at the time he is being questioned.

Dr. Burbridge also testified that, based upon his experiments, he believed that neither the Thorazine nor the alcohol, because of the potentiating effect they have upon each other, would be dissipated from the system within 16 hours[9] from the time that the Thorazine was administered.

---

[7]Dr. Jackson described the effect of Thorazine in the same terms.

[8]Dr. Burbridge distinguished the reasons that a tranquilizer like Thorazine produces sleep from the reasons that a hypnotic drug would produce sleep. Tranquilizers and hypnotic drugs operate upon different levels of the brain. A hypnotic drug will induce sleep because it operates upon the area of the brain that controls thought process and consciousness. An individual under the influence of a hypnotic drug is rendered unconscious. A tranquilizer, on the other hand, does not operate upon the areas of the brain that control consciousness, but upon the areas of the brain that control the reactions of a conscious individual to his environment. Tranquilizers produce sleep by removing the anxiety or worry that is keeping the individual awake. He is then enabled to go to sleep. However, he can be roused from that sleep and will behave in a conscious manner, despite the fact that he is still under the influence of the drug. The drug is still having the effect of removing the normal anxiety or worry reactions the individual would have to his environment. With a hypnotic drug, on the other hand, the fact that the individual is conscious indicates that he is no longer under the influence of the drug.

[9]Dr. Jackson testified that the drug is normally eliminated from the system within eight hours. It must be noted, however, that this presupposed a normal initial dose, and did not take into account the fact that the presence of the alcohol in the blood stream would delay by more than 50 percent the rate at which the drug was dissipated. The alcohol

Dr. Burbridge further testified that Thorazine tended to make a person amenable or agreeable to the wishes of others, in the sense that he would become unable to see any reason to oppose doing what others wished of him. Under the influence of Thorazine, he would not resist requests made of him by others. Dr. Catton testified to the same effect.

Dr. Burbridge described the physical symptoms of a person heavily under the influence of Thorazine as slowed speech and short answers. "He won't slur his speech, as when he is drunk, but whereas without Thorazine he would not only answer a question but amplify on it, with the Thorazine the words will come slowly and he would make his answers as short as possible." Drs. Tipton and Jackson noted mental and physical retardation and slowness of petitioner's speech when they interviewed him at DeWitt State Hospital. The tapes show these symptoms of slowness of speech and shortness of answers, as compared with the more rapid speech and the more voluble answers appearing from the tape of Cameron's first interrogation.

It thus appears from the overwhelming weight of the evidence that Cameron was substantially under the influence of Thorazine throughout the last three interrogations and that his will to resist was destroyed because he was rendered unable to comprehend the seriousness of his predicament or the significance to him of acceding step by step to "remembering"[10] the prosecution's reconstruction of his crime. His

---

would potentiate Thorazine both in regard to the effect the drug would have and the length of time during which the subject would be under its influence.

[10]All three defense psychiatrists Dr. Catton, Dr. Adams, and Dr. Burbridge, and both prosecution psychiatrists, Dr. Jackson and Dr. Tipton, agreed that Cameron was suffering true amnesia at the time of the trial. They disagreed, however, as to whether his amnesia was primary or secondary. The defense psychiatrists opined that it was primary amnesia; i.e., that his memory never recorded the occurrences because he was in a dissociative state due to pathological intoxication at the time of the killing. The prosecution psychiatrists opined that he suffered secondary amnesia; i.e., that he was not dissociative when the killing occurred (although they agreed he was pathologically intoxicated at the time) and his memory recorded the events, but subsequently blocked out the memory because it was too painful. It must be noted that the latter seemed to base their opinions primarily on the fact that when they interviewed Cameron on December 23 at 11 a.m., he stated that he "remembered" certain of the acts he was told he had committed during his interview with Mr. Mulkey the night before. The only doctor who examined Cameron for the specific purpose of testing his memory was Dr. Adams. He believed Cameron was suffering principally from true primary amnesia. Part of the examination administered by Dr. Adams consisted of a sodium pentothol test. Sodium pentothol is a hypnotic drug that is

confessions during those interrogations were not "the product of a rational intellect and a free will." (*Blackburn* v. *Alabama, supra,* 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].)

The Attorney General contends, however, that Cameron's failure to object to the admission of the second confession at the trial precludes his challenging its admissibility now. He further contends that any error in the trial court's rulings admitting the third and fourth confessions into evidence is harmless because the first and second confessions were properly in evidence. There is no merit in these contentions.

From the record at the trial it appears as a matter of law that the second confession was involuntary. In such a case, a defendant is not precluded from raising the issue on appeal even though he did not object in the trial court. (*People* v. *Matteson* (1964) 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161], and cases cited; see also *People* v. *Castro* (1968) 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62]; *People* v. *Rand* (1962) 202 Cal.App.2d 668, 672-674 [21 Cal.Rptr. 89].) Since Cameron's abandonment of his appeal is excusable, he may properly challenge the second confession for the first time in these proceedings.

Moreover, even if the second confession were deemed properly in evidence, it would not render harmless the error in admitting the third and fourth confessions. Ordinarily, the introduction into evidence of an unconstitutionally obtained confession compels reversal regardless of other evidence of guilt. (See *People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137], and cases cited.) We have recognized an exception to that rule in the case of a confession obtained in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], when there was also in evidence an equally or more damaging admissible confession made before the inadmissible confession and thus there was no danger that the former was the product of the latter. (*People* v. *Cotter* (1965) 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d

used with amnesics, as it enables the doctor to place the patient ·in a drug-induced hypnotic state and discover whether there is a memory despite the mental block. Although the results of the sodium pentothol test are not admissible, Dr. Adams testified that his diagnosis of true primary amnesia was confirmed by the results of the test.

862]., vacated on other grounds (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035]; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 329-331 [46 Cal.Rptr. 515, 405 P.2d 555].) We need not decide whether this exception may also apply in the case of an involuntary confession, for in no event is it applicable when, as in the present case, "the admissible evidence does not include an equally damaging confession." (*People* v. *Price* (1965) 63 Cal.2d 370, 377 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Powell, supra,* 67 Cal.2d 32, 54.)

 In determining Cameron's criminal responsibility for the homicide, a critical issue was the extent of his intoxication and his state of mind at the time of the killing. Evidence of his memory of the events was crucial to that issue. (See footnote, 10, *supra.*) In his confession to the psychiatrists, Cameron purported to remember only the barest details of the crime, details that Mr. Mulkey had reported to him the night.before and passed on to the psychiatrists before their interview. By the time of the third and fourth confessions, the officers had learned many more details of the crime and had informed Cameron of them. He purported to remember these details for the first time in his third and fourth confessions, and his memory of them, if real, was devastating to his defense.

Although the judgment must be set aside because of the use of Cameron's involuntary confessions against him, it is necessary to consider the question of the loss or suppression of evidence. The police or prosecution may disable the state from ever giving a defendant a fair trial if they have lost or destroyed or otherwise made unavailable vital defense evidence. (See *People* v. *Hall* (1964) 62 Cal.2d 104, 112. fn. 8 [41 Cal.Rptr. 284, 396 P.2d 700]; *In re Imbler, supra,* 60 Cal.2d 554, 567; *People* v. *Carter* (1957) 48 Cal.2d 737, 747 [312 P.2d 665].) If this were such a case, Cameron should be discharged rather than remanded for a new trial.

 The referee found that no evidence was suppressed, but that two items had been lost. One was a colored film taken of the interior of the trailer shortly after the arrival of the police, and the second was a man's plaid shirt depicted in a photograph as being under the body's right forearm. The referee found that the colored film depicted the same areas shown in black and white photographs, and that the photographs were of better quality than the film. He concluded that the film would have been merely cumulative of other evidence available to the defense. He found that the shirt had been

identified as the victim's by her sister-in-law and would not have been material to indicate that someone other than Cameron and Mrs. Malone were in the trailer at the time of the killing. He therefore concluded that neither item would have aided the defense in any material manner.

The record fully supports the referee's findings and conclusions in this respect, and we adopt them. Accordingly, Cameron is not entitled to be discharged.

The writ is granted. The judgment against Cameron is set aside and he is remanded to the custody of the Superior Court of Butte County for a new trial.

Peters, J., Tobriner, J., and Sullivan J., concurred.

MOSK, J.—I dissent.

There is no question that habeas corpus is a proper remedy to challenge violations of constitutional rights relevant to the determination of guilt if the petitioner presents an adequate excuse for failing to invoke his remedy by appeal. I do not believe that a valid excuse exists under the circumstances before us.

The majority adopt a subjective test: what were petitioner's innermost fears, apprehensions and motives at the time he abandoned his earlier appeal? He is an intelligent young man, a college student, and was represented by able counsel of his own choice. It cannot be doubted that abandonment of the appeal was a deliberate step taken after mature reflection. To presently undertake a search of the deepest recesses of his mind as of that earlier date in order to fathom motivation impresses me as a chimerical and futile exercise.

In the absence of some objective manifestation of reasonable reliance upon erroneous or outmoded legal authority, abandonment of the appeal should preclude granting relief in these habeas corpus proceedings.

If it be assumed arguendo that some circumstances could justify relief under the majority's subjective formula, the writ should nevertheless be denied here.

This petitioner was convicted of murder in the first degree after an exhaustive trial in which he was defended by vigorous and experienced counsel. Two earlier trials had resulted in jury disagreement. In the first two trials no objection was made to the introduction of any of the confessions. In the third trial, no objection was made to the first two confessions, but only to the third and fourth statements.

This court held in *People* v. *Matteson* (1964) 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161], that the "introduction of an involuntary confession or admission requires reversal of a judgment of conviction despite defendant's failure to object to its introduction." (Also see *People* v. *Underwood* (1964) 61 Cal.2d 113, 126 [37 Cal.Rptr. 313, 389 P.2d 937].) Categorically stated, that is sound law. But its application is not invariable.

Not infrequently counsel choose defense trial tactics which dictate that a statement, even though properly objectionable, be received in evidence. To permit raising the issue of admissibility for the first time on habeas corpus long after conviction would place our stamp of approval on strategy of opportunism. As long ago as *People* v. *Kramer* (1897) 117 Cal. 647, 650-651 [49 P. 842], this court said: "It is an obviously just rule that such objection cannot be here made for the first time. . . . The defendant cannot remain silent and take the chance of a favorable issue, and, losing, urge as ground for reversal an error, which, but for his silence, might never have found its way into the case. His failure to object justly gives rise to the inference that at the time he saw no injury being done him, and he cannot complain on being met here by a barrier arising from his own omission."

When defense counsel raised no objection to the introduction of any of the confessions in the first two trials and none to the first two confessions in the third trial, it must be assumed this omission was by design. Indeed, there is ample reason to conclude that not only did counsel deem the statements nonprejudicial but they also believed the manifest remorse of the petitioner to be beneficial to his cause. Their maneuver obviously did not fail in the first two trials. Our role on review is not to second-guess trial tactics, nor to reward calculated strategy which was ultimately frustrated below. (*People* v. *Reeves* (1966) 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35].) Yet the majority do so when they condemn as inadmissible statements which defense counsel considered properly before the jury. The consequence of the majority opinion, though not explicitly stated, is to expect a trial court to reject *sua sponte* evidence to which neither party offers an objection and which both parties desire in the record. This is an unreasonably heroic requirement for trial judges.

Finally, the majority undertake to reweigh the facts another time and to reach a conclusion on the voluntariness of

defendant's confessions contrary to that of the original trier of fact, and contrary to the considered findings of the referee appointed by this court, Judge Perluss of the Sacramento Superior Court. I would adopt the facts found and the conclusions reached by the referee, and I do so *in haec verba* (references to the transcripts have been omitted):

4. *The evidence*

a. *The taped confession made at approximately 1 a.m. on December 23, 1958.*

Petitioner's first confession was taped and was made at approximately 1 a.m. on December 23, 1958, in the Chico police station in the presence of a sheriff's captain and a deputy district attorney. At the commencement of the interrogation, the deputy district attorney smelled the odor of alcohol on petitioner's breath and requested Dr. Ted Oster, a qualified medical doctor, to give petitioner a sobriety test. Dr. Oster conducted various tests including the Romberg test and other physical tests and determined that petitioner was "mentally alert." He was of the opinion that petitioner's mind was working in a "rational manner" and was not under the influence of alcohol insofar as the drunk driving laws were concerned despite a blood alcohol count of .18.

The deputy district attorney stated that the petitioner was lucid and the sheriff's captain indicated that the petitioner understood the questions he was asked and talked intelligently.

. The taped confession was played at the reference hearing. To the referee it appeared that petitioner's voice was somewhat slurred but his answers were rational and he seemed coherent. In the middle of the tape petitioner began to cry and he cried and broke down at the end of the tape. Nevertheless, he was able to answer questions such as those relating to the residence of his parents, where he went to school, the age of his child and an adapter for his camera. Unquestionably, petitioner was emotionally upset and remorseful but the referee does not believe that he was irrational and that he did not exercise his own judgment in making the first confession.

b. *The confession made at DeWitt State Hospital at approximately 11 a.m. on December 23, 1958.*

After his first interrogation and confession, petitioner was taken to the Butte County Hospital where he was admitted as a mental hold to prevent him from harming himself. At

approximately 3:30 a.m., Nurse Julia Caton administered 300 mgs. of Thorazine to petitioner at the direction of Dr. Paul R. Swinderman. Dr. Swinderman did not see petitioner personally and did not know he had been drinking. He testified that the drug would cause a person under the influence of alcohol to take a longer time than usual in becoming sober.

At approximately 9 a.m. petitioner was taken to DeWitt State Hospital in Auburn. He dozed at times en route and had juice, coffee and doughnuts in the town of Lincoln. Petitioner arrived at the hospital at approximately 11 a.m. where he was examined by Drs. Carl Jackson and G. D. Tipton, psychiatrists. The petitioner told the doctors the facts which he remembered which were a confession of the crime.

The doctors did not know that Thorazine had been administered to petitioner. He appeared to be suffering from a hangover, his clothing was disheveled and he held his head as though he had a headache. His speech was slow.

Although there can be no question but that petitioner received an unusually massive dosage of Thorazine, a fair reading of the evidence establishes that petitioner was able to exercise his judgment in making his second confession.

Dr. Thomas Burbridge, petitioner's witness, said: "Yes, one of the characteristics of the, of a tranquilizer is, as compared to an ordinary hypnotic sedative, is what, as a matter of fact is one of the ways you separate them from an ordinary hypnotic sedative, like a barbiturate, or alcohol, is that he is easier aroused. The person will sleep but then if you shake him and wake him up and put a question to him he will be able to answer it, or he will be able to, if he could, he is stimulated enough to play a bridge game, but he will not play his best game, and his questions will not be answered with clarity that it ordinarily would be."

Dr. Burbridge also said:

"Q. Now thorazine is a tranquilizer?

"A. Thorazine is a tranquilizer. If a large dose is given, enough to produce sleep, you will awaken the person, he will arouse easily, he will answer questions quite well without any trouble at all.

"Q. Even with a fairly heavy dose?

"A. With a fairly, with a fairly heavy dose, yes."

As to the combined effects of alcohol and Thorazine, Dr. Burbridge, in commenting on the third interrogation of petitioner at 1:30 p.m., approximately two hours subsequent to the instant confession, testified that he would not state that

petitioner's free will was destroyed and that he had the ability to choose whether he would answer questions or not.

A portion of the recross-examination of Dr. G. D. Tipton by Judge Friedman, petitioner's counsel, at petitioner's second trial is of interest:

"Q. I see. Well, doctor, let me ask you this: Isn't it a fact the people who have been given thorazine are readily amenable to suggestion?

"A. I can't say that they are. I don't know why they should be.

"Q. Well, neither do I, doctor. It is your opinion they are not, is that right?

"A. Yes, that is right."

c. *The taped confession made at approximately 3 p.m. on December 23, 1958.*

Upon completion of his interview at DeWitt State Hospital, petitioner was taken to the Bureau of Criminal Identification and Investigation in Sacramento where he again was interrogated. Two polygraph examinations were run. The referee permitted limited inquiry of Mr. Joseph F. McVarish, the then polygraph operator, as to whether petitioner's responses fluctuated normally for the purpose of ascertaining whether at that time petitioner was under the influence of alcohol or Thorazine or both. Petitioner was normally responsive and was alert and attentive.

This taped confession also was played at the hearing. Petitioner's voice was not slurred and he was able to remember details of the crime.

The referee believes that petitioner did exercise his own judgment in making this confession.

d. *The confession made at approximately 8 p.m. on December 23, 1958.*

Following the interrogation in Sacramento, petitioner was taken to the Butte County jail in Oroville, arriving at about 6 p.m. At approximately 8 p.m., petitioner was interrogated and again confessed. This confession, too, was tape recorded.

Petitioner contends that then he was threatened by Sheriff Gillick who questioned him. The tape confession was played at the hearing. The referee is unable to find any threats in manner, tone of voice or in content.

A closer question is presented by petitioner's assertion that he was questioned after his counsel had informed the sheriff not to question petitioner without an attorney being present.

Judge Barr, petitioner's former counsel, was unable to assist the referee in this regard at the reference hearing. At petitioner's third trial, however, Judge Barr testified that he phoned Sheriff Gillick in the afternoon of December 23, and requested him not to interrogate petitioner further. Mr. Alexander Cameron, petitioner's father, states he heard Judge Barr make this statement over the telephone.

On the other hand, Sheriff Gillick testified that Judge Barr asked only where petitioner was and said nothing about statements. Thelma Mosely, the sheriff's secretary, had been directed to listen to the telephone conversation. She testified Judge Barr said nothing about statements or interrogations.

After reviewing the conflicting evidence carefully, the referee has concluded that no restrictive admonition was given to the sheriff by counsel before petitioner's interrogation. Even if this were not so, the referee believes that the "rare case" principle of which Mr. Justice Mosk speaks in *People* v. *Powell* (July 18, 1967) 67 Cal.2d 32, 51-55 [59 Cal. Rptr. 817, 429 P.2d 137], would be applicable here. It would be an "*Escobedo-Dorado* rule" error, and the fourth confession added nothing to the three prior confessions heretofore found to be voluntary.

5. *The alleged suppression of evidence.*

The referee also was directed to ascertain whether representatives of the State of California lost or suppressed any evidence, the introduction of which would have been favorable to petitioner's defense.

The referee finds that no evidence was suppressed. It does appear, however, that two items have been lost.

The first item was a roll of colored motion picture film of the victim's trailer which was lost prior to the first trial. No evidence was offered to the referee to indicate that the film would have been favorable to petitioner. To the contrary, the former district attorney who had viewed the film testified that the still photographs used at the trials were far better in clarity.

The second lost item is what appears to be a man's style plaid shirt depicted in Petitioner's Exhibit 5a. The picture was taken before the body was moved and the shirt was under the victim's right forearm. The shirt was not produced and apparently was lost.

The victim's sister-in-law, Mrs. Elsie Robinson, specifically identified the plaid shirt as belonging to the victim, and its

absence was used by petitioner's counsel to suggest that a person other than petitioner had committed the crime. The referee cannot find that the lost plaid shirt if produced would have been favorable to petitioner's defense.

## FINDINGS OF FACT

Responsive to the questions propounded by the Court, it is found:

1. Despite petitioner's consumption of alcoholic beverages, his taped confession made at approximately 1 a.m. on December 23. 1958, was voluntary.

2. Despite petitioner's consumption of alcoholic beverages and the administration to him of Thorazine, his confession made to the physicians at DeWitt State Hospital at approximately 11 a.m. on December 23, 1958, was voluntary.

3. Despite petitioner's consumption of alcoholic beverages and the administration to him of Thorazine, his taped confession made at approximately 3 p.m. on December 23, 1958, was voluntary.

4. The taped confession petitioner made at approximately 8 p.m. on December 23, 1958, was voluntary.

5. No evidence was suppressed or lost by any representative of the State of California the introduction of which would have been favorable to petitioner's defense.

I would therefore deny the petition.

McComb, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied May 22, 1968. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.