[Crim. No. 6600. Fifth Dist. Apr. 6, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES HINDS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Parts II, III and IV are not published, as they do not meet the standards for publication contained in California Rules of Court, rule 976 (b).

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Lisa Short, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gregory W. Baugher and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON (P. D.), J.**—Michael James Hinds appeals from a judgment of conviction of first degree murder with personal use of a firearm (Pen. Code, §§ 187, 12022.5), challenging the admissibility of his extrajudicial statements to police on *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and voluntariness grounds. Respondent concedes *Miranda* error and "overbearing" police tactics. This wrongful conduct compels us to reverse; because a taped confession obtained in gross violation of appellant's Fifth and Fourteenth Amendment rights was introduced at trial, appellant's conviction cannot stand.

## FACTS

On August 16, 1981, 19-year-old Michael Hinds killed his friend, Kenneth White, who was 21, with eight to nine blasts from a 12-gauge shotgun. There was no dispute at trial that appellant committed the homicide and that the killing was unlawful; the issues for the jury concerned the nature of the crime: whether appellant committed manslaughter or murder, and if murder, the degree of murder.

Sixteen-year-old Michelle M. had known the victim, Kenny White, since grade school and had dated him during a few months in 1981. They argued constantly. Michelle had slapped Kenny on at least one occasion, but he had never hit her. About five months prior to August 16, 1981, the relationship ended.

Michelle had known appellant for approximately five years and had shared a close "brother-sister" relationship with him for approximately one year. Appellant had been close friends with Kenny for some time prior to August 16. Appellant had been present during arguments between Kenny and Michelle which continued after the breakup of their relationship. Michelle admitted she frequently started quarrels because she was jealous of the friendship between the two men. Michelle never saw the men argue, although she heard appellant tell Kenny to " 'watch it' " if Kenny started to "get out of hand" in arguments with Michelle.

On Sunday, August 16, 1981, appellant and Kenny spent most of the day together. They saw Michelle a couple of times, and also went target practicing and hunting with appellant's stepfather's 12-gauge shotgun at about noon. Both were in a good mood. In the evening, appellant and Kenny watched television and drank beer at Kenny's house with Michelle and two other friends. During the evening, Michelle and Kenny engaged in yet another argument, yelling and cursing at each other concerning Michelle's jealous feelings about appellant spending his time with Kenny. Appellant was present and told both of them to " 'Cool it. Both of you shut up.' "

At approximately 10:30 p.m., apparently a short time after the argument, appellant and Kenny left in Kenny's TransAm to shoot rabbits. They did not appear to be angry at each other. Approximately one-half hour later, appellant returned alone. He explained to Michelle and the others present that Kenny had called Michelle a " 'bitch,' " which precipitated an argument; appellant said Kenny made him get out of the car at Kenny's house and drove away. Appellant was acting normally while relating this story. He then asked Michelle to step outside.

Outside, appellant told Michelle he had shot Kenny; he was crying and upset. Appellant took Michelle to the site of the killing and put Kenny's body in the trunk of the automobile; he then took Michelle home. Appellant asked his friend Bret Bollinger to go with him for a ride. On Highway 58, they picked up two women hitchhikers, Brenda Hixon and Casandra Craft, who accompanied them as far as Tehachapi. North of Mojave, appellant turned onto a dirt road, dropped off Bret, drove 50 yards farther and buried the body.

Appellant returned to Bakersfield with Bret; on the way they again picked up Hixon and Craft in Tehachapi. In the meantime, Michelle told her mother of Kenny's death and her mother called the police. Appellant was told by his stepfather that the police were looking for him and appellant left Bakersfield with the two hitchhikers. Appellant spent the rest of the night and the next day at Hixon's mother's house near Lake Isabella. He was arrested on August 18 in Mojave.

## DISCUSSION

### I

 Appellant's principal claim of reversible error concerns the introduction at trial of the final and most damaging segments of a taped statement to police, which both parties treat as a complete confession to the crime of first degree murder.[2] Appellant contends use of this evidence was

---

[2]Respondent does not argue that the taped statement was an admission rather than a confession, thus invoking a different standard of reversible error. While the erroneous admission of a confession is reversible per se, improper introduction of an admission is not reversible if the prosecution can demonstrate beyond a reasonable doubt that the error did not contribute to the verdict. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) Presumably this argument was not made because (1) the statement almost certainly qualifies as a confession and (2) even if the statement arguably might be considered an admission, its use at trial could not be found harmless beyond a reasonable doubt. (See *People* v. *Powell* (1967) 67 Cal.2d 32, 52-57 [59 Cal.Rptr. 817, 429 P.2d 137].)

A confession is a declaration of the defendant's intentional participation in a criminal act and must include all elements of the crime. (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 756.) In the final part of the taped interrogation, appellant conceded that prior to driving out to the site of the shooting, he was extremely angry with Kenny because of the latter's conduct toward Michelle, and that appellant's anger had been building for some time. Appellant said he started thinking about this when they arrived at the target area and he got the gun. Appellant walked 50 to 60 feet from the car, asked Kenny to set up a target and loaded the shotgun.

Appellant said he deliberately shot Kenny in the back from 20 to 25 feet away because appellant was "really pissed about the way [the victim] treated Michele [*sic*]." Appellant then shot the victim, who was lying on the ground but was still moving, five more times in the back and chest; appellant reloaded twice and at one point went back to the car for more shells. Appellant commented ". . . there was no justiful [*sic*] cause really . . . ."

This statement describes a deliberate calculated killing in retribution for what appellant

reversible error per se because the confession was the product of multiple *Miranda* violations and impermissibly coercive tactics. Respondent concedes such constitutional violations, but contends the conviction should be affirmed under the "rare case" exception to the rule of per se reversal. We conclude the doctrine argued by respondent has no application to this case and reverse the conviction.

On the morning of August 18, 1981, appellant was apprehended in Mojave, arrested and taken first to the Mojave substation and from there to the Bakersfield Police Department. During the trip, appellant was not advised of his rights and was not interrogated. Detective William Vines of the Bakersfield Police Department testified that he and Detective Richard Herman interviewed appellant at the police department starting at 3:45 p.m.

Five segments (five sides of three cassette tapes) of the interrogation of appellant were recorded. Only the final two were admitted at trial, based on the trial court's Evidence Code section 352 ruling. The first segment of the recordings contains the conceded *Miranda* violations as well as implied threats or promises of leniency. It is evident appellant had admitted he shot and killed someone when the officers began to tape the interrogation. The questioner first mentioned "[o]ther things you have to look at," and referred to previous comments by appellant. The questioner then suggested appellant could get the death penalty or "turn around and walk out the door," and explained, "because we weren't there all we can do is assume the worst *until you tell us different.*" (Italics added.)

It is clear appellant had not been advised of his rights. Appellant finally insisted he be advised: "I know you gotta do it anyway," and the questioner did so, but not before deliberately misleading appellant concerning his right against self-incrimination, by telling him: "[A]nything you say doesn't necessarily held [*sic*] against you, it can be held to help you, depending on what happened."

The detective read the *Miranda* warnings from a card, but spoke softly and indistinctly; it is barely possible to hear the admonition, "Anything you say can and will be used against you in a court of law." Upon completing this reading, the detective did not ask appellant whether he understood his rights and wished to waive them; instead, he inquired, "You want . . . me to write something down."

considered intolerable transgressions by the victim. However, even if the statement is susceptible to interpretation that the crime was less than first degree murder (appellant continued to assert in his final version of events that he "freaked") and is therefore an admission, its use at trial could not have been harmless beyond a reasonable doubt. The reasons why this is so are fully explored below in discussing respondent's contention that this case qualifies for the "rare case" exception to the rule of per se reversal.

At that point, appellant asked: "Tell me the truth, wouldn't it be best if I had an attorney with me?" Rather than ceasing interrogation, the questioner first stated this was for appellant to decide, and then suggested that if appellant called an attorney, the detectives could not help appellant anymore, and that an attorney would not be the one going to jail, possibly facing "first degree murder, special circumstances and the death penalty." After further persuasion in the form of exhortations that appellant was the only one that could tell them if it was "a goddamn shootout or . . . a fight, or guys were drunk or it was an accident . . .," appellant admitted shooting Kenny accidentally and then going "blank" when the victim screamed that he would kill appellant.

Thereafter, the detectives elicited numerous details about appellant's activities before and after the shooting; appellant repeatedly maintained that the first shot was an accident. Toward the end of this segment, one of the detectives told appellant at length that he thought appellant was lying and "playing games." The detective confronted appellant with apparent discrepancies between his account of what happened and appellant's admissions to his friends. However, appellant continued to claim the incident was an accident.

As the interrogation continued, appellant denied there was any argument between him and Kenny. Appellant discussed with the detectives the type of gun used and events after the shooting. Appellant again stated he did not mean to shoot the first time, insisting he was telling the truth. Appellant commented ". . . I might be 90 years old before I see daylight again and then again I may never see it. . . . [¶] I'm heading down a one way path is all I see."

The fourth side of the tape recording begins with a formal advisement of rights and a "waiver" by appellant. On the recording, appellant's responses are virtually inaudible. Appellant again related the events of the killing, stating that the first shot was an accident. Thereafter, the detectives repeatedly accused appellant of lying because his story conflicted with statements reported by his friends, and exhorted him to tell the truth.

When appellant again stated, "It was an accident," Herman suggested that appellant's refusal to admit intentionally killing the victim was cowardly and would make things worse for appellant, as well as for his friends and his mother. The detectives pointed out that appellant's friends would be forced to testify against him, and asserted that the jury would not believe his conflicting story. They told appellant they had promised to talk to his mother about him and stressed how important it was to be able to tell her that he had told the truth. The detectives also stated repeatedly that appellant

should be "man enough" to tell the truth. They told him they could tell he was lying but wanted to tell the truth, and that he would not be able to continue to live with such a lie. Appellant responded, "I don't even think I'm gonna see 30."

At the beginning of the final segment, appellant asked where he would be housed in the jail and the detective assured him he would have the choice of protective custody or placement with the regular inmate population. Appellant then asked about a phone and requested to call his stepfather. When appellant returned from the phone call he was obviously sobbing. He said, "Dad's never steered me wrong, if he says tell you [I] might as well tell you." Appellant explained he had needed to talk to somebody "close to me." However, before he resumed his account of the crime, he asked the detectives to turn off the tape recorder. They agreed to do so, and shut off one machine but continued to record the interrogation through a hidden recorder.

Appellant said his earlier account was partially true, but admitted "from the part when I told you . . . I raised the gun and it went off accidentally I kind of fell downhill right there." For the first time, appellant admitted to the detectives that prior to driving to the scene of the shooting, he was extremely angry with Kenny because of the latter's conduct toward Michelle and that appellant's anger had been building for sometime. Appellant explained that Kenny and Michelle had another fight that evening, and "I don't put up with no shit with nobody over her."

Appellant said this was not in his mind until they arrived at the target area, but "we got out there when I pulled out the gun, I just started thinking about it. I said, man[,] ain't nobody gonna fuck her like he did, you know, fuck around and he did it as far as I was concerned he had done it." Appellant said he "got out of the car and started thinking about it and I had the gun and he started walking out there to set up the targets . . . ." Appellant walked about 50 to 60 feet from the car, loaded the shotgun and shot the victim in the back at a range of 20 to 25 feet. At the time he did so he was "really pissed about the way [the victim] treated Michelle."

Appellant told the detectives that Kenny fell on his side and said, " 'I'll kill you motherfucker.' " Appellant explained, "at that point in time I didn't give a fuck what he had to say." Appellant shot Kenny with the remaining barrel of the shotgun, reloaded from two shells he had in his pocket, and shot the victim two more times. Appellant said he thought Kenny was still moving. Appellant went back to the car, got more shells, reloaded, and fired two more times from a closer range. The shots hit the victim in the back and chest.

The detectives then asked appellant to go back to the scene of the shooting with them, and appellant agreed. He directed them to the spot and showed them where the car was parked, where he stood when he fired the shots, and where the victim had fallen.

A. At trial, appellant objected to admission of any portion of the tapes, arguing that the detectives violated appellant's *Miranda* rights at the outset of the interrogation, which violation invalidated any purported waivers and tainted the entire statement. Appellant also objected that he should have been readvised after the telephone call to his stepfather and argued that the final segment should be excluded because the recording was surreptitious.

The prosecutor conceded that as to the initial *Miranda* warning, there "may be an argument of whether there is a waiver or not," but argued that appellant validly waived his rights after the second advisement. The prosecutor also asserted appellant's statement was free and voluntary.

The trial court ruled that appellant was properly advised of his rights on both occasions; on the first occasion, appellant impliedly waived his rights by neither expressly exercising nor expressly waiving them, and on the second occasion, appellant expressly waived his rights. The trial court held the entire statement was admissible over appellant's *Miranda* objections; however, the first segment was excluded under Evidence Code section 352 because the contents were cumulative and included references to prior offenses by appellant, as well as offensive language.

■■■ The trial court's ruling rejecting appellant's *Miranda* objections was clearly erroneous. ■■■ Because the facts relating to this issue are uncontradicted, we need not defer to the trial court's finding. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) As respondent concedes, the record shows several blatant *Miranda* violations; appellant suggests additional possibilities.

■■■ First, respondent concedes that appellant was not advised of his rights in timely fashion. ■■■ In *Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706], the United States Supreme Court held that where law enforcement officers undertake custodial interrogation of a suspect, specific procedural safeguards must be followed to protect the individual's Fifth and Fourteenth Amendment privilege against self-incrimination. Specifically, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Ibid.*) The reason for *Miranda*'s requirement of express advisement of rights is to dispel the coercion inherent

in an environment of incommunicado, police-dominated interrogation. (*Id.*, at pp. 457-458 [16 L.Ed.2d at pp. 713-714].) "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." (*Id.*, at p. 467 [16 L.Ed.2d at p. 719].)

In *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050], the California Supreme Court addressed the problem of police officers engaging in preadvisement conversations calculated to "soften[] up" a suspect. ■ The court held that a suspect in custody must be given his rights under *Miranda* before the police may conduct any significant conversations intended to elicit a waiver of *Miranda* rights. (*Id.*, at pp. 160-161.) ■ Here, the violation is more obvious than that in *Honeycutt*, where the conversation skirted the subject of the offense. (*Id.*, at pp. 158-159.) The detectives engaged in an undisguised effort to persuade appellant to talk about the offense without first advising him of his constitutional rights. Such conduct violates more than the "spirit" of *Miranda*. (See *People* v. *Honeycutt, supra*, at p. 160.)

Second, before appellant was advised of his rights, the detectives deliberately misled appellant concerning his right against self-incrimination. In order to persuade appellant to discuss the offense, one detective twisted the required advisement: "[A]nything you say doesn't necessarily held [*sic*] against you, it can be held to help you, depending on what happened." The detective subsequently read appellant his rights from a card, but then reiterated that the police could not help appellant unless he told them what happened.

In *People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1177-1178 [196 Cal.Rptr. 466], misadvisement as to the need for an attorney was held to invalidate any waiver of rights. Here, the detectives employed additional pressure by repeatedly suggesting they had to assume the worst, e.g., the death penalty, until appellant told them otherwise; such statements implied that the police might consider appellant less culpable if he talked to them.

Third, respondent apparently concedes that appellant invoked his right to counsel when he said, "Tell me the truth, wouldn't it be best if I had an attorney with me?" ■ Upon an assertion of the right to counsel, all questioning must cease until an attorney is present. (*Edwards* v. *Arizona*

(1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880].) Numerous cases have held language strikingly similar to appellant's question to constitute adequate invocations of the suspect's rights. (See *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 735-736 [125 Cal.Rptr. 798, 542 P.2d 1390] [" 'Do you think we need an attorney?' " or " 'I guess we need a lawyer' "]; *People* v. *Munoz* (1978) 83 Cal.App.3d 993, 995 [148 Cal.Rptr. 165] [" 'Well, maybe I should talk to my attorney, . . .' "]; *People* v. *Duran* (1983) 140 Cal.App.3d 485, 490-492 [189 Cal.Rptr. 595] [" 'Well then I think it's better that I have an attorney here' "]; *People* v. *Russo, supra,* 148 Cal.App.3d 1172, 1176-1177 [" 'I don't know if I should have a lawyer here or what . . . .' "].)

██ Under California law, "a suspect may invoke his right to silence by any words or conduct reasonably inconsistent with a present willingness to discuss his case freely and completely." (*People* v. *Duran, supra,* 140 Cal.App.3d 485, 492.) "Ambiguous statements are to be construed as invocations. . . ." (*Ibid.*; see also *People* v. *Randall* (1970) 1 Cal.3d 948, 955-958 [83 Cal.Rptr. 658, 464 P.2d 114].) Although clarifying questions may be permissible where it is unclear whether a suspect understands his rights or intends to waive them (see *People* v. *Turnage* (1975) 45 Cal.App.3d 201, 211 [119 Cal.Rptr. 237]), this record shows no attempt to clarify. ██ Rather, the detectives actively sought to dissuade appellant from demanding an attorney by suggesting that an attorney would prevent the police from helping appellant, and stating that appellant, not the attorney, was the one facing jail.

Appellant contends that the detectives' attempt to dissuade appellant from seeking counsel by suggesting this would be counter to his interests constitutes a fourth level of *Miranda* violation. We agree. Obviously, the "procedural safeguards" of *Miranda* are meaningless if the police may continue to exert pressure to talk on a suspect who indicates a present unwillingness to discuss the case. (See *People* v. *Enriquez* (1977) 19 Cal.3d 221, 237-238 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].)

Respondent concedes that under *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], lack of an initial valid waiver, for any and all of the foregoing reasons, invalidates any subsequent waiver. (See also *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149], holding that Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) does not apply retroactively.) Because of the pattern of interrogation, the entire taped statement should have been excluded.

Appellant claims two additional *Miranda* violations, asserting that his request to make a telephone call to his stepfather was a second invocation of

appellant's *Miranda* rights (citing *People* v. *Burton* (1971) 6 Cal.3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793]), and that the continued interrogation after appellant requested the tape recorder be turned off constitutes a further violation of *Miranda* (citing *People* v. *Braeseke* (1979) 25 Cal.3d 691, 702-703 [159 Cal.Rptr. 684, 602 P.2d 384] [reaffirmed upon remand from the United States Supreme Court, 28 Cal.3d 86, 87 (168 Cal.Rptr. 603, 618 P.2d 149)]). *People* v. *Burton, supra,* 6 Cal.3d 375 is distinguishable because appellant was not a minor. However, appellant's remaining argument has merit.

Appellant contends that his expression of reluctance to proceed with the tape recorder on was equivalent to a request to speak "off the record." In *Braeseke,* the court held that a request to speak off the record cannot constitute a knowing and intelligent waiver of the suspect's rights, and in that case the police contributed to the defendant's lack of understanding by acceding to the request. (*People* v. *Braeseke, supra,* 25 Cal.3d at pp. 702-703.) In *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 267-268 [169 Cal.Rptr. 497], the *Braeseke* rationale was applied where the defendant requested that a tape recorder be turned off and asked to speak privately with one officer. Appellant's request indicates a continuing reluctance to discuss the case "freely and completely." (*People* v. *Duran, supra,* 140 Cal.App.3d 485, 492.)

The record shows without contradiction numerous *Miranda* violations which tainted the entire interrogation. As discussed below, introduction of appellant's taped confession at trial was reversible error per se. (See *People* v. *McClary, supra,* 20 Cal.3d 218, 230.)

B. For the first time on appeal, appellant also challenges the voluntariness of the taped confession. The question of the admissibility of the tapes was before the trial judge on appellant's claims of *Miranda* violations. The prosecutor argued that appellant validly waived his *Miranda* rights and that the statement was "free and voluntary"; the trial judge expressly ruled the entire taped statement was admissible beyond a reasonable doubt. ■ Appellant's failure to argue the voluntariness issue below does not preclude consideration of the point in this appeal.

■ The prosecution has the burden of proving beyond a reasonable doubt the voluntariness of a confession or admission made by an accused to the police. (*People* v. *Jimenez, supra,* 21 Cal.3d 595, 606-609.) Thus, an essential prerequisite to admissibility is a foundational showing that the defendant's statements were freely and voluntarily given. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 490-493, pp. 457-464 and 1982 Supp., § 492A, p. 210.) ■ This court must independently examine the uncontradicted

evidence to determine whether the record supports the trial court's implied finding that appellant's confession was voluntary. (*Jimenez, supra,* 21 Cal.3d at p. 609.)

 Here, the Attorney General concedes "overbearing" conduct and the uncontradicted evidence offered by the prosecution—the taped interrogation itself—shows the confession was obtained by use of impermissibly coercive police tactics. Because use of a coerced confession constitutes a denial of federal due process (*Jackson* v. *Denno* (1964) 378 U.S. 368, 376-377 [12 L.Ed.2d 908, 915, 84 S.Ct. 1774, 1 A.L.R.3d 1205]), the lack of a specific objection is immaterial. (*In re Cameron* (1968) 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633]; *People* v. *Underwood* (1964) 61 Cal.2d 113, 126 [37 Cal.Rptr. 313, 389 P.2d 937].)[3] "In order to be voluntary, a confession must be 'the product of a rational intellect and a free will.' [Citation.] The fifth amendment secures 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.' [Citation.] Consequently, a confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' [Citations.]

"A confession is involuntary whether coerced by physical intimidation or psychological pressure. [Citation.] Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.' " (*United States* v. *Tingle* (9th Cir. 1981) 658 F.2d 1332, 1335.)

 In determining the question of voluntariness of appellant's statements, we are required to consider the entire record below. (*Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898-899, 86 S.Ct. 1761]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 674, 682 [78 Cal.Rptr. 270].) We must examine "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041] quoted in *People* v. *Hogan* (1982) 31 Cal.3d 815, 841

---

[3]The egregious *Miranda* violations discussed above alone require reversal of appellant's conviction; however, we also address the overbearing practices employed to obtain the confession, hoping to prevent repetition of these abuses. Once again, we remind law enforcement, the prosecution and the trial court that such means are intolerable in a free society, necessitate reversals, and cause inexcusable waste of time and money. See *Haynes* v. *Washington* (1963) 373 U.S. 503 at page 519 [10 L.Ed.2d 513 at page 524, 83 S.Ct. 1336].

[183 Cal.Rptr. 817, 647 P.2d 93].) Considering the totality of circumstances surrounding this interrogation, we conclude that appellant's will to resist confessing was overborne by undue pressure.

The record shows appellant was 19 years old, immature and relatively unsophisticated, although he had been convicted of several property theft offenses and had served some time in jail. When arrested, he had been on the run for one and one-half days and had spent the night hiding in a garage in Mojave. The tape recordings reveal that appellant was distraught and remorseful; on several occasions during the interrogation he broke down and sobbed. Appellant testified at trial that he was "deathly scared" while making statements to the officers.

The detectives employed improper pressures to induce appellant to give up his rights and confess even before they gave him the advisements required by *Miranda*. The officers repeatedly suggested to appellant that if he "told them the truth," his penalty might be less; in the same remarks, they suggested that if appellant did not explain to them mitigating factors, he might get the death penalty. As discussed above in connection with appellant's *Miranda* arguments, the detectives deliberately misled appellant concerning his right against self-incrimination, suggesting he could help himself, rather than "hang" himself, as appellant put it, by discussing with them what happened. Also, after appellant finally was given his *Miranda* rights, the detectives did not honor appellant's invocation of his right to counsel, and strongly pressured him against demanding an attorney, falsely representing that appellant would be worse off if he had a lawyer.

 Threats, express or implied, of heavy punishment, accompanied by promises or suggestions of leniency or other advantage if a confession is given, render a statement inadmissible. Such tactics are distinguishable from mere exhortation to tell the truth. (See *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Flores* (1983) 144 Cal.App.3d 459, 468-471 [192 Cal.Rptr. 772]; *People* v. *Nicholas, supra,* 112 Cal.App.3d 249, 266.) The detectives' implied promise that if appellant incriminated himself by telling what happened he could improve his prospects, and the thinly-veiled threat of the death penalty if he did not tell his side of the story, clearly led appellant to tell the story of an accidental killing.

Thereafter, with no break in the interrogation, the detectives hammered away at appellant's claim of accident for over an hour. They used psychologically coercive tactics to wear down his will to resist, inducing him to incriminate himself further. The officers repeatedly suggested appellant's refusal to admit he intentionally killed the victim was cowardly, and would

make things worse for appellant, as well as harder on his friends and his mother. As discussed in appellant's brief, the pressures employed here are similar to those condemned in *People* v. *Johnson* (1969) 70 Cal.2d 469, 479 [74 Cal.Rptr. 889, 450 P.2d 265], and *People* v. *Hogan, supra,* 31 Cal.3d 815. The pressures plainly were a motivating cause of appellant's confession and the record cannot support a finding beyond a reasonable doubt that the confession was voluntary. (*Hogan, supra,* at p. 843.)

C. Despite concessions that appellant's confession was erroneously introduced at trial on *Miranda* and voluntariness grounds, respondent contends the first degree murder conviction should be affirmed under the "rare case" exception to the rule of per se reversal. ■■ Improper introduction of a confession normally constitutes reversible error per se regardless of the type of error involved because a confession is considered such persuasive evidence of guilt that it is "extremely difficult to determine what part it played in securing the conviction." (*People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Schader* (1965) 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665].)

However, prior California cases have recognized a limited exception to this rule in the "rare case" in which, although one or more confessions were admitted erroneously, the jury also had before it other valid confessions by the defendant containing substantially the same details, the erroneously admitted confessions were not unduly emphasized at trial, and the legally obtained confessions were not induced by an invalid confession. (*People* v. *Quicke* (1969) 71 Cal.2d 502, 516-518 [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555].) In *Jacobson,* the leading case, the prosecution introduced evidence of ten separate confessions or admissions made by defendant on the day of the homicide, the last two of which were obtained in violation of defendant's right to counsel under *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. The court affirmed, finding that no one statement contained details significantly different from the others, and that the statements taken in violation of *Escobedo-Dorado* were merely cumulative.

The "rare case" exception to automatic reversal was based upon the perception that in the unusual circumstances of those cases, there was no reasonable possibility the erroneously admitted evidence contributed to the judgment. (*People* v. *Jacobson, supra,* 63 Cal.2d at pp. 330-331; see also *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862] [vacated on another ground in *Cotter* v. *California* (1967) 386 U.S. 274 (18 L.Ed.2d 43, 87 S.Ct. 1035)], applying the exception where the defendant

gave seven statements, four of which were admissible, and three of which were not.)

■ Appellant questions whether the exception has any validity as applied to involuntary confessions or confessions obtained in violation of *Miranda*. We note that under existing United States Supreme Court precedent, "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.'" (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 303, 98 S.Ct. 2408].) Numerous cases hold that introduction of a coerced confession may never be considered harmless error. (*Jackson* v. *Denno, supra,* 378 U.S. 368, 376 [12 L.Ed.2d 908, 915]; *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 537-538 [9 L.Ed.2d 922, 928, 83 S.Ct. 917]; *Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [5 L.Ed.2d 760, 766, 81 S.Ct. 735]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567-568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844]; see also *New Jersey* v. *Portash* (1979) 440 U.S. 450, 459 [59 L.Ed.2d 501, 510, 99 S.Ct. 1292] and *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065] ["[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, . . ."].) The Supreme Court has applied the per se rule even where other confessions by the defendant were properly in evidence. (*Haynes* v. *Washington, supra,* 373 U.S. 503, 505-507, 518, 520-521 [10 L.Ed.2d 513, 516-517, 523, 525]; *Stroble* v. *California* (1952) 343 U.S. 181, 190 [96 L.Ed. 872, 880-881, 72 S.Ct. 599]; *Malinski* v. *New York* (1945) 324 U.S. 401, 404, 407-410 [89 L.Ed. 1029, 1032, 1033-1035, 65 S.Ct. 781]; but see *Milton* v. *Wainwright* (1972) 407 U.S. 371 [33 L.Ed.2d 1, 92 S.Ct. 2174], in which the majority rejected Fifth and Sixth Amendment challenges and held that introduction of evidence of petitioner's fourth confession, made to an officer posing as a fellow prisoner in jail after petitioner had been indicted and had retained counsel, was harmless beyond a reasonable doubt.)

Appellant correctly points out that the California Supreme Court cases cited by respondent involved violations of *Escobedo-Dorado*. In *In re Cameron, supra,* 68 Cal.2d 487, 504, the court expressly declined to decide whether the "rare case" exception might apply where an involuntary confession was used, "for in no event is it applicable when, as in the present case, 'the admissible evidence does not include an equally damaging confession.'" Although the reviewing court in *People* v. *Nicholas, supra,* 112 Cal.App.3d 249, applied the exception despite findings that a confession introduced at trial was *both* involuntary and obtained in violation of *Miranda*, we decline to follow *Nicholas* on this point.

■ We conclude that the policies underlying the prohibition against use of involuntary confessions preclude application of the "rare case" exception to automatic reversal to cases in which a coerced confession was introduced at trial. As noted above, the exception is founded upon the presumed insignificant effect of the improper evidence on the jury. However, the rule forbidding use of *involuntary* confessions is based on other values in addition to the interest in ensuring the reliability of the factfinding process. "As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." (*Blackburn v. Alabama* (1960) 361 U.S. 199, 206-207 [4 L.Ed.2d 242, 248, 80 S.Ct. 274].)

These considerations include society's interests in preserving the "freedom of will" of the individual, deterring police misconduct and safeguarding the integrity of the criminal justice system. (*Blackburn v. Alabama, supra,* 361 U.S. at p. 207 [4 L.Ed.2d at p. 248]; *Spano v. New York* (1959) 360 U.S. 315, 320-321 [3 L.Ed.2d 1265, 1270, 79 S.Ct. 1202]; *United States v. Powe* (D.C. Cir. 1978) 591 F.2d 833, 840-841; see also *People v. Jimenez, supra,* 21 Cal.3d 595, 605.) This "complex of values" requires reversal regardless of whether other evidence establishes guilt or verifies the truth of the confession (*Blackburn v. Alabama, supra,* 361 U.S. at pp. 206-207 [4 L.Ed.2d at p. 248]); application of even a "rare case" rule of harmless error is inconsistent with the fundamental policies proscribing use of coerced confessions.[4]

■ Even if the arcane doctrine urged by respondent were applicable where the prosecution introduces a defendant's involuntary confession, this plainly is not a "rare case." Although the improperly obtained confession could not have influenced appellant's other statements because it followed them, neither of the remaining requirements for the exception can be satisfied. Cases decided subsequent to *Jacobson* have held the exception inapplicable where "the admissible evidence does not include an equally damaging confession." (*People v. Price* (1965) 63 Cal.2d 370, 377 [46 Cal.Rptr. 775, 406 P.2d 55]; *People v. Quicke, supra,* 71 Cal.2d 502, 516; *In re Morse* (1969) 70 Cal.2d 702, 708-709 [76 Cal.Rptr. 385, 452 P.2d

---

[4]In light of this conclusion, we need not address the question whether the "rare case" exception might apply where the sole constitutional defect is a *Miranda* violation. (See *People v. Murtishaw, supra,* 29 Cal.3d 733, 753, 756; *People v. Randall, supra,* 1 Cal.3d 948, 958.)

601].) Here, appellant's properly introduced admissions differ in significant details from his taped confession and were not equally damaging.

Before appellant was taken into custody, he made incriminating statements to five people who testified at trial before appellant's taped statements were played for the jury. Respondent contends the jury learned nothing significantly new or different from the tapes; however, this contention is not supported by the record.

From appellant's statements to Michelle and Bret, the jury learned only that he shot and killed Kenny, and that "[i]t had something to do with Michelle." Appellant told Mrs. Jane Hixon, Brenda's mother, that he had killed someone accidentally while shooting at targets. Appellant made more damaging admissions to Brenda Hixon and Casandra Craft. Appellant told Hixon that he and the victim "got into an argument and went target shooting, and while [the victim] was setting up the targets, he shot him." Appellant explained that he shot the victim in the back and then in the stomach, and as the victim was not dead, he went back to the car and got more shells which he used to shoot the victim in the legs. Appellant told Hixon he and the victim had been drinking and got into an argument over the pink slip of the car. Appellant also told Craft the shooting was over a car. He admitted shooting the victim a total of seven times, going back to the car for more shells.

Although these statements were highly incriminating, they do not contain all the significant details brought out in the taped interrogation. Most notably, the admissions lack any detail about appellant's mental state at the time of the shooting. (See *In re Cameron, supra,* 68 Cal.2d 487, 497, 502-504.) Here, as in *Cameron,* the issue to be determined was the *degree* of appellant's criminal responsibility. The crucial factual question concerned appellant's mental state and the circumstances leading to the shooting. The details of appellant's thoughts, feelings and actions were extremely important, and the tape contains several damaging details not found elsewhere.

Only in the taped confession did appellant admit that before he shot the victim, he was thinking that Kenny had treated Michelle in a manner appellant *would not tolerate. The tape recording also contains appellant's* statement that although Kenny screamed at him after the first shot, appellant did not care what Kenny had to say at that point. Such details of appellant's thoughts at the time of the shooting may well have been devastating to appellant's defense that he was so beside himself with anger before and during the killing that he was not thinking at all.

Furthermore, appellant's admissions to others were not consistent in their details. Appellant told his close friends, Michelle and Bret, that the shooting had something to do with Michelle. He told Brenda and Casandra, who were casual acquaintances, that the killing occurred in an argument over the car; this possible motive is basically unsupported in the remainder of the record. (During the interrogation, appellant indignantly denied the shooting had anything to do with the car.) The improperly introduced confession obviously was not merely cumulative.[5]

Finally, the prosecution relied very heavily upon the taped statement to convict appellant of first degree murder. The district attorney repeatedly quoted at length from the transcript of the interrogation to impeach the testimony of appellant and Dr. Aniline, the defense psychiatrist, that appellant was not thinking and did not premeditate or deliberate at the time of the shooting. In argument to the jury, the prosecutor referred to the taped statement again and again, arguing that appellant's own words showed that "his mind was working at all times, . . ."

For the reasons discussed above, the *Jacobson-Cotter* exception has no application to this case; the erroneous introduction of appellant's confession to police requires automatic reversal of the conviction.[6]

## II-IV[7]

. . . . . . . . . . . . . . . . . . . . . .

[5]Respondent correctly points out that none of the witnesses who testified to appellant's prearrest statements had any apparent bias against him or motive to fabricate. However, their evidence simply did not have the detail and completeness of appellant's taped confession. Also, consideration should be given to the probable impact on the jury of hearing appellant admit he had lied and then confess to an intentional, vengeful killing. (See *People* v. *Hogan, supra,* 31 Cal.3d 815, 844.) During deliberations, the jury requested the court to replay the final segment of the taped statement (the portion following appellant's return from the telephone call to his stepfather). The jury also requested written copies of the instructions concerning premeditation, the degrees of murder and manslaughter, as well as further instruction on the meaning of premeditation.

[6]Respondent suggests, quoting from *People* v. *Nicholas, supra,* 112 Cal.App.3d 249, 272 that this court should consider the probable difficulties of retrying appellant in determining whether use of the confession mandates reversal. In fact, the quote from *Nicholas* merely states the rationale for the exception, and is obviously of no assistance in determining whether an involuntary confession is merely cumulative of other admissions in a given case. The prosecution should have considered any difficulties in retrying appellant when it pressed to introduce a confession obtained by the described gross violations of appellant's constitutional rights.

[7]See footnote 1, *ante,* page 222.

The judgment is reversed.

Franson, Acting P. J., and Zenovich, J., concurred.