Filed 6/17/25  P. v. Pineda CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br>v.<br>MARCIAL C. PINEDA,<br><br>  Defendant and Appellant. | A169628<br><br>(Solano County Super. Ct.<br> No. FCR360442) |

A jury convicted Marcial Pineda of felony assault with a semiautomatic firearm and shooting at an occupied vehicle, along with enhancements for the personal use of a firearm.  On appeal, Pineda contends the trial court erred: (1) by admitting into evidence his statements to police because they were secured without a voluntary waiver of his *Miranda*[1] rights; and (2) in failing to stay his sentence under Penal Code[2] section 654 for shooting at an occupied vehicle.

As to Pineda's first contention, we disagree.  As to his second, the Attorney General concedes, and we agree, that the trial court erred in failing to stay Pineda's sentence for shooting at an occupied vehicle because it was based on the same conduct that resulted in his assault conviction.  But

_____

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2] Further statutory references are to the Penal Code.

1

because this determination does not change the duration of the trial court's concurrent sentencing order, rather than remand, we adopt the parties' agreed suggestion to order modification of the existing sentence directly. We otherwise affirm the judgment.

## BACKGROUND

On the evening of September 12, 2021, N.L. was driving home on eastbound Interstate 80 in Fairfield when she noticed a black SUV coming towards her, "kind of pushing her." N.L. thought the SUV driver was trying to change lanes, but instead the SUV cut her off and got in front of her. As both vehicles exited the freeway, N.L. slowed down, trying to keep a distance from the SUV. N.L. trailed behind the SUV down the exit ramp and stopped at the traffic light. Both vehicles turned left onto Waterman Boulevard; N.L. stayed in the right lane, and the SUV pulled into one of the left lanes. Both vehicles stopped at the next traffic light, where N.L. was preparing to make a right turn. There were no other cars around. N.L. looked over at the SUV and noticed its passenger side window open. She was able to see the driver, whom she identified in court as Pineda. N.L. looked "eye to eye" with the driver for "maybe, I don't know, five seconds, three seconds," but neither N.L. nor Pineda communicated verbally or made any gestures.

"[I]nstantly when [N.L.] turned," she "felt that boom feeling on [her] car"; her first thought was "oh, my God, I got shot at." She did not see a gun being fired or who shot at her. N.L. kept driving, checked to see whether she was hurt, and looked in the rearview mirror but did not see anyone following behind her. Once N.L. parked in her garage, she noticed a hole in the front driver's side door that she thought was from a bullet. N.L. and her husband called 911.

Officer Ryan Parodi was the first officer to arrive at N.L.'s residence and noted that the damage to N.L.'s driver side door was consistent with a bullet strike; the bullet appeared to have entered the car at an angle from the rear, moving towards the front, leaving a small entry mark in the airbag control module of the steering wheel. N.L. described the vehicle that had been next to her when she felt the "boom" as a newer black SUV with a license plate that started with the number "8." Parodi was able to secure a full license plate number from dispatch.[3]

Once additional officers arrived at N.L.'s residence, including Officer Lauren Gomez, Parodi drove to the scene of the shooting. He did not find casings or other physical evidence but noted a license plate reading camera just past the intersection. The camera is part of a system of cameras within the city that has "gunshot detection as well as the ability to take photographs of license plates and vehicles without license plates and determine make, model" of the vehicle passing by. Parodi entered the complete license plate number into the camera system, which returned a match for a plate on a black Volkswagen Tiguan crossing through the intersection at 8:26 p.m. that evening; Pineda was one of the registered owners.

Separately, Gomez conducted a six-person photographic lineup with N.L., who identified two people as potentially being involved in the incident, one of whom was Pineda.

Approximately three hours after the shooting, officers located the black Volkswagen Tiguan with the matching plate in a nearby parking lot; Pineda

---

[3] Dispatch had obtained the full license plate number from an unrelated 911 caller reporting a separate road rage incident that same night in the same area also involving a black SUV. The trial court prohibited the introduction of this separate incident into evidence but permitted reference to the full license plate number. This ruling is not challenged on appeal.

appeared to be sleeping inside.  Officers directed Pineda to get out of his car and walk backwards towards them.  Officers observed a handgun in the back pocket of the passenger seat of the vehicle with a magazine inserted in it.  After securing a search warrant for the vehicle, the officers retrieved the handgun—a loaded semiautomatic Glock 19—and found a second magazine loaded with ammunition, as well as a spent shell casing on the rear passenger side floorboard.  Officers discovered additional rifle ammunition in a backpack located in the trunk of the vehicle.

At the scene of the arrest, Gomez and Officer Amanda Graham interviewed Pineda in a police car.  Gomez read Pineda his *Miranda* rights from a preprinted card, concluding with the question, "Do you understand these rights?"  Pineda responded, "I guess, yeah," and Gomez asked, "Do you want me to repeat them?"  Pineda answered, "Um, no -no - no, I - I totally understand, but like, I don't understand why you arrested me."  Gomez followed up, "Do you wanna talk to me after reading these to you?"  Pineda responded, "Um sure, like . . . I wanna know what's going on?"  Gomez then began the interview by saying, "So we saw the gun in your vehicle."  Pineda acknowledged the gun was his; it was registered "under my name."  He knew it was loaded, and he had it with him in the vehicle because he was living in the car "because my wife, she's always pushing me out."  Pineda denied firing the gun or being involved in any kind of road rage incident within the prior 24 hours.

Approximately two hours later, Gomez and Graham interviewed Pineda again at the police station.  As Pineda was brought into the interview room, Gomez asked, "All right, you remember those rights I read to you earlier?"  Pineda replied, "Yes."  Gomez continued, "Do you need me to reread them to you?"  Pineda verbally responded with a nonspecific, "uh, um" and, as

is visible on the video from Gomez's body camera, shrugged his shoulders and shook his head from side to side. Graham stated, "We just want to make sure you remember because we want to talk to you" and told Pineda to have a seat. Pineda instead turned around to show Graham his handcuffs, complaining his hands felt swollen. After Graham said she could "fit a pinky in there," Pineda laughed and turned around and sat down.

Gomez did not read Pineda his *Miranda* rights again. The ensuing interview lasted less than 10 minutes, during which Pineda acknowledged shooting the firearm because the car following him "was just being pushy. And I slam on the brakes a couple of times to get it off and it kept on following me." Pineda explained, "I didn't shoot the gun to try to hit anybody. It's just like, for – to me, it was just like trying to scare that person off." Pineda fired the gun because he felt unsafe, "like that person was probably gonna try and shoot me or something because he kept on following me."

At the time of trial, Pineda was charged with three felonies—shooting a firearm at an occupied vehicle (§ 246; count 1); assault with a semiautomatic firearm (§ 245, subd. (b); count 2); assault with a firearm as a lesser-included offense of count 2 (§ 245, subd. (a); count 3)—and one misdemeanor violation for possession of a concealed firearm in a vehicle (§ 25400, subd. (a)(1); count 4). Counts 2 and 3 included allegations for the personal use of a handgun (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)). Counts 1 through 3 also alleged three aggravating enhancements: (1) that the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (California Rules of Court, rule[4] 4.421(a)(1)); (2) that Pineda was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)); and (3)

---

[4] Further rule references are to the California Rules of Court.

5

that Pineda's prior convictions are numerous or of increasing seriousness (rule 4.421(b)(2)).  The court bifurcated the trial on the factors in aggravation. The district attorney dismissed count 4, the misdemeanor concealed firearm charge, prior to closing argument.

The jury convicted Pineda of counts 1 and 2—shooting at an occupied vehicle and assault with a semiautomatic firearm—and found the enhancement for personal use of a firearm in the commission of count 2 to be true.[5]  At the sentencing hearing, the trial court denied Pineda's request to dismiss the count 2 conviction for assault with a semiautomatic firearm and the firearm enhancement.  The court sentenced Pineda to 10 years in state prison for the assault with a semiautomatic firearm (middle term of six years plus four years for the firearm use enhancement), and a concurrent term of five years for shooting at an occupied vehicle.

## DISCUSSION

### A. Miranda *Waiver*

Pineda contends that the trial court erred in admitting his statements to police because he was intoxicated at the time of the arrest, which nullified any apparent waiver of his *Miranda* rights and made his subsequent statements involuntary.  We disagree.

" 'Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' (*Miranda, supra*, 384 U.S. at p. 444 . . . .)"

---

[5] The jury did not complete a verdict form for the lesser offense charged in count 3, as they were directed to leave the form blank if they found Pineda guilty of count 2.  Also, at the conclusion of the bifurcated trial on the factors in aggravation, the jury found "not true" the enhancements alleging great violence and being armed with a weapon.

(*People v. Hin* (2025) 17 Cal.5th 401, 432 (*Hin*).) " '*Miranda* holds that the "defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. ' " (*People v. Smith* (2007) 40 Cal.4th 483, 501–502 (*Smith*), quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421.)

"When reviewing constitutional claims regarding *Miranda* advisement and waiver, we will accept the trial court's findings if supported by substantial evidence but will 'independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citations.]" (*Hin, supra,* 17 Cal.5th at p. 432.) "Where . . . an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

Pineda acknowledges "the mere fact that a defendant has consumed drugs or alcohol does not, of itself, establish an impairment of capacity," (citing *People v. Jackson* (1989) 49 Cal.3d 1170, 1189), but emphasizes that "courts have recognized that consuming drugs or alcohol may impair a defendant's ability to exercise rational intellect and free will, with the result

7

that their statements are not voluntary." Pineda contends that is the case here, where Gomez testified that Pineda appeared "slightly intoxicated" at the time he was arrested; his speech was "slurred," his eyes were "bloodshot" and "watery," he had a "mildly unsteady gait" and difficulty following the officers' directions to walk backward. Although Gomez did not know Pineda's "exact level of intoxication," she believed he was "impaired"; an opinion further supported, he argues, by the body camera footage of the second interview purportedly showing Pineda had "difficulty sitting in a chair and keeping [his] eyes open." He asserts this "inability to follow simple commands shows significant impairment in basic understanding, the ability to process information, and thought processes." As such, Pineda contends he did not have the capacity to "exercise rational intellect," rendering any subsequent statement involuntary.

To start, voluntariness must be determined by a preponderance of the evidence. (See, e.g., *People v. Markham* (1989) 49 Cal.3d 63, 71 ["The Constitution of the United States requires no more than that the voluntariness of confessions or admissions be proved by a preponderance of the evidence at trial. (*Lego v. Twomey* (1972) 404 U.S. 477, 489.) Section 28(d)[6] [article I of the California Constitution] establishes that standard as the rule in California"].) And our Supreme Court " 'has repeatedly rejected claims of incapacity or incompetence to waive *Miranda* rights premised upon voluntary intoxication or ingestion of drugs' alone." (*Hin*, *supra*, 17 Cal.5th

---

[6] Proposition 9, commonly known as "Marsy's Law," amended article I of the California Constitution in multiple respects not applicable here, resulting in the renumbering of former section 28, subdivision (d), as section 28, subdivision (f)(2). (See Cal. Const., art I, § 28 ["Amended by Initiative Measure (Prop. 9, § 4.1, approved Nov. 4, 2008, eff. Nov. 5, 2008"].) Hereinafter, we therefore refer to section 28(f)(2) rather than section 28(d) when referencing the truth-in-evidence provision of Proposition 8.

at p. 435, quoting *People v. Clark* (1993) 5 Cal.4th 950, 988.) To prevail on such a theory, Pineda "would have had to establish his consumption of alcohol so impaired his reasoning that he was incapable of freely and rationally choosing to waive his rights and speak with the officers." (*People v. Frye* (1998) 18 Cal.4th 894, 988, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Pineda has not done so, and his cited authorities offer no additional support.

For example, in *In re Cameron* (1968) 68 Cal.2d 487 (*Cameron*),[7] the California Supreme Court determined the defendant's initial statements were voluntary, despite his blood alcohol level of 0.18 percent, obvious signs of intoxication ("his speech was slurred and he had obvious difficulty pronouncing certain combinations of words . . . ; he occasionally rambled on irrelevant subjects"), and being emotionally distraught. (*Id.* at p. 499.) The

---

[7] Noting Pineda concedes his statements were not coerced, the Attorney General appropriately objects to Pineda's reliance on *Cameron* as "foreclosed by" the truth-in-evidence provisions of Proposition 8 (Cal. Const., art. I, § 28(f)(2)) and *Colorado v. Connelly* (1986) 479 U.S. 157, 164–167, which held that coercive police activity is a necessary predicate to finding that an admission is not voluntary. We agree that evidence of a defective mental condition is insufficient to demonstrate the involuntariness of a *Miranda* waiver or confession in the absence of police coercion. (See, e.g., *People v. Cox* (1990) 221 Cal.App.3d 980, 986–987 [holding that pre-Proposition 8 authority that deemed admissions involuntary and inadmissible because of defective mental conditions, regardless of the existence of police coercion, "created a standard of constitutional admissibility higher than the federal standard [and] is no longer viable"].)

However, because "the voluntariness of . . . an admission on the one hand, and a knowing and intelligent [*Miranda*] waiver on the other, are discrete inquiries," we consider *Cameron*, which continues to support Pineda's knowing and intelligent *Miranda* waiver. (See *Edwards v. Arizona* (1981) 451 U.S. 477, 484; *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 15–19, 20–22.)

court based its decision on the "coherence, rationality, and responsiveness of [defendant's] answers," and particularly his ability to resist telling the interrogator "any real memory of the details of the crime." (*Ibid*.) The court distinguished this initial admissible statement from the subsequent statements it deemed involuntary because by the time of the latter statements the defendant had been administered Thorazine, a drug that reduces a person's "normal anxiety reactions to a point where he is no longer disturbed by what normally would be upsetting factors in his environment," which when mixed with alcohol "potentiated each other." (*Id.* at pp. 500–501.) By then, the defendant's confessions were no longer "the product of a rational intellect and a free will," because he "was substantially under the influence of Thorazine," and "his will to resist was destroyed because he was rendered unable to comprehend the seriousness of his predicament." (*Id.* at pp. 502–503.) Since "[a] confession is involuntary unless it is 'the product of a rational intellect and a free will,' " the admission of these latter statements was improper. (*Id.* at p. 498; see also *Townsend v. Sain* (1963) 372 U.S. 293, 297–298, 302, 307–308 [holding that a statement given after the administration of a drug known as "truth serum" was not voluntary].)

Recognizing there is no suggestion of coercion here, the body camera footage of Pineda's interview and the substance of the statements themselves demonstrate that Pineda's *Miranda* waiver was "the product of a rational intellect and a free will." When Gomez initially spoke with Pineda, who was seated in a police car, she started by saying, "Sir . . . I'm going to read you your *Miranda* rights." Without hesitation or question, Pineda immediately responded, "Go ahead." Once Gomez finished reading the *Miranda* rights from a pre-printed card, she asked Pineda, "Do you understand these rights?" When Pineda responded, "I guess, yeah," Officer Gomez followed up, "Do you

want me to repeat them?" Pineda answered, "Um, no, no, no . . . I totally understand, but like, I don't understand why you arrested me." Officer Gomez then asked, "Do you want to talk to me after reading these to you?" Pineda casually responded, "Um, sure . . . I wanna know what's going on?"

This entire exchange lasted less than one minute, and the full interview took three and a half minutes. In that time, Pineda appears relaxed, responsive, and cordial; he is smiling and utters a half laugh between some questions; his answers are comprehensible and logical. At no time did Pineda ever object to the questioning or demonstrate any misunderstanding of the situation. Instead, Pineda clearly explained that he owned the gun the officers saw in his vehicle, it was registered to him, and he had it loaded and in his car because his wife had "pushed him out," resulting in Pineda living in his car: "What do you want me to do? Leave that in my - in my - at my house?" Pineda then denied firing the gun or being involved in any kind of road rage incident within the prior 24 hours.

Pineda's appearance, conduct, and the substance of his statements demonstrate " 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Smith*, *supra*, 40 Cal.4th at pp. 501–502.) His explanation for his gun possession and denial of culpability demonstrates a "level of comprehension" that shows his understanding of the "seriousness of his predicament" consistent with the admitted statements in cases such as *Cameron*. (*Cameron*, *supra*, 68 Cal.2d at p. 502.) As such, the admission of Pineda's voluntary statements after the initial *Miranda* admonishment was not error.[8]

---

[8] Pineda attempts to bolster his argument of impairment during the initial interview in the police car by referencing Pineda's conduct in the second interview in the police station, conducted two hours later. He contends that in that second interview Pineda had "difficulty sitting in a

11

## B. Miranda *Readvisement*

Pineda further asserts that his statement taken at the police station was inadmissible, "because Gomez did not obtain a valid waiver from Pineda before the first interrogation, she had to 'readvise' him before questioning him the second time in order to obtain the necessary valid waiver for the first time." Having concluded the initial waiver was voluntary, this argument fails. Moreover, nothing in the record demonstrates a readvisement was necessary.

Pineda acknowledges our Supreme Court's "repeated" holding " 'that a *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver." ' [Citation.] We have recognized five factors to be weighed when considering that totality of circumstances: '1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that defendant subjectively understands and waives his rights.' " (*Hin*, *supra*, 17 Cal.5th at pp. 432–433, quoting *Smith*, *supra*, 40 Cal.4th at p. 504.) Courts have upheld breaks between interviews lasting almost two days. (See, e.g., *People v. Williams* (2010)

---

chair and keeping [his] eyes open," which "shows significant impairment in basic understanding, the ability to process information, and thought processes." First, as *Cameron* permits, the level of potential impairment in the second interview does not necessarily negate the voluntariness of Pineda's statements in the first interview. (*Cameron*, *supra*, 68 Cal.2d at pp. 498–503.) Second, as is further discussed below, the body camera footage of the second interview does not support Pineda's assertion of a level of intoxication sufficient to negate voluntariness.

49 Cal.4th 405, 435 [40 hours]; *People v. Pearson* (2012) 53 Cal.4th 306, 317 [27 hours]; *Smith*, at pp. 504–505 [12 hours]; *Hin*, at p. 433 [4 hours].) And a change in interview location does not necessarily require readvisement. (See *People v. Mickle* (1991) 54 Cal.3d 140, 169 [subsequent interview 36 hours later in different location did not require readvisement].)

Here, consideration of the relevant factors supports the trial court's finding that readvisement was not necessary and Pineda's police station statement was admissible. First, the interviews were close in time: the first took place around midnight, and the second began approximately two hours later. Second, although the location of the interview changed, Pineda remained in police custody throughout, and the questioning officers remained the same. Third, before beginning the second interview, Gomez asked Pineda if he remembered his *Miranda* rights, and Pineda plainly said, "Yes." When asked if he wanted them read to him again, Pineda shrugged his shoulders and shook his head in the negative. This exchange serves as a sufficient reminder and acknowledgement of the prior advisement. Fourth, as alleged in the information and discussed in limine, Pineda had prior convictions "of increasing seriousness,"[9] which demonstrates he had prior experience with police. And fifth, as discussed, Pineda's conduct during the interview demonstrates his understanding of the situation.

Even so, Pineda continues to stress his impairment negates what otherwise appears to be an appropriate waiver, both initially in the police car and two hours later at the police station. Focusing on the police station interview, Pineda claims that he, "start[ed] off leaning with his head back

---

[9] Pineda suffered three prior misdemeanor convictions: carrying a loaded firearm (§ 12031, subd. (a)(1)) in 2005, carrying a concealed firearm within a vehicle (§ 25400, subd. (a)(1)) and driving under the influence (Veh. Code, § 23152, subd. (b)), both in 2016.

13

and supported by the wall, and with his eyes closed" and "had difficulty sitting in a chair and keeping [his] eyes open."

But the actual video footage—which Pineda asks us to examine[10]— undermines these representations. When the interview begins, Pineda is standing. After declining a *Miranda* readvisement, Pineda turns his back toward Graham so she can check his handcuffs, complaining that his hands feel swollen. The officers direct Pineda to sit, which he does. Only then does he lean back against the back of the chair and wall, but his eyes are not closed. Gomez begins, "All right. So . . . here's what's going on," and starts enumerating the evidence they have found. With each piece of stated evidence, Pineda blinks in seeming acknowledgement. Gomez concludes, "We got your car on city cameras and we know that you shot your gun at somebody driving today and we want to know why you did it." Pineda responds, "You wanna know why I did it? [M]aybe you should ask the person to not be on somebody's ass and pushing people." There is no hesitation, no demonstration of misunderstanding, and no difficulty keeping his eyes open. Over the next six minutes, Pineda goes on to coherently explain what he did and why he did it, including specific details about his wife and his work

_____

[10] Pineda cites *People v. Duff, supra*, 58 Cal.4th at page 551, for the principle that "[w]here, as here, an interview is recorded . . . the facts surrounding the statements are undisputed . . . the reviewing court applies independent review," rather than deferring to the trial court's factual determinations. The Attorney General disagrees, contending, "But this rule applies only when reviewing the voluntary nature of a defendant's statements, not the voluntary nature of a *Miranda* waiver. Thus, the substantial evidence rule applies and gives great deference to the trial court's resolution of disputed facts." We need not resolve the issue because review of the body camera footage supports the trial court's finding that any potential impairment did not undermine Pineda's apparent waiver and demonstrated voluntary participation in the two interviews.

history.  As with the initial interview, nothing in the record demonstrates Pineda was impaired to a level that required readvisement of his *Miranda* rights or negated his apparent voluntary participation in the police station interview.  (See *Smith*, *supra*, 40 Cal.4th at p. 505.)  Because we find no error in the statements' admission, we need not proceed with a harmless error analysis.

## C. *Section 654*

Pineda contends the trial court erred in violation of section 654 when it directed the sentence on count 1, shooting at an occupied vehicle, to run concurrently with the sentence on count 2, assault with a semiautomatic firearm, because the convictions were based on the same conduct.  (§ 654.)  The Attorney General concedes the error, and we agree.

Section 654, subdivision (a), provides that " ' "in no case shall the act or omission be punished under more than one provision." ' "  To start, we must determine if the " 'different crimes were completed by a "single physical act." ' " (*People v. Washington* (2021) 61 Cal.App.5th 776, 795, quoting *People v. Corpening* (2016) 2 Cal.5th 307, 311.)  " 'Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses.' [Citation.]  When the facts are undisputed, the application of section 654 raises a question of law we review de novo." (*Ibid*.)  When a court determines that a conviction falls within the meaning of section 654, "rather than dismissing charges or imposing concurrent sentences, . . . it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence." (*People v. Duff*, *supra*, 50 Cal.4th at p. 796.)

Here, it is undisputed that Pineda's convictions for assault with a semiautomatic firearm and shooting at an occupied vehicle, both stemmed from his single act of shooting one bullet from his handgun out of the passenger side window towards N.L.'s car. Because "[a] new sentencing hearing will not change appellant's actual prison time because the sentencing error relates only to a count that was ordered to run concurrently," the Attorney General asks that this court modify the judgment directly rather than remand for resentencing, consistent with *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473. Pineda agrees, "it is appropriate for this court to order that the judgment be modified to reflect a stayed five-year term on the shooting conviction." (E.g., *People v. Butler* (1996) 43 Cal.App.4th 1224, 1248.)

Accordingly, we exercise our inherent authority to order the judgment modified to impose and stay pursuant to section 654 the five-year term for shooting at an occupied vehicle. (§ 1260; see *People v. Alford*, *supra*, 180 Cal.App.4th at p. 1473.)

## DISPOSITION

The abstract of judgment shall be amended to reflect that the five-year sentence for shooting at an occupied vehicle (count 1) is stayed under section 654; a copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

16

DESAUTELS, J.


We concur:


RICHMAN, ACTING P. J.


MILLER, J.


*People v. Pineda* (A169628)